982 A.2d 483

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Brentt Michael SHERWOOD, Appellant.**

Supreme Court of Pennsylvania.

Argued May 13, 2009.

Decided Nov. 6, 2009.

94

Michael David Suders, Esq., Mifflinburg, for Brentt Michael Sherwood.

Anthony J. Rosini, Esq., Shamokin; Amy Zapp, Esq., Harrisburg, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD, McCAFFERY and GREENSPAN, JJ.

## *OPINION*

Justice GREENSPAN.

Appellant Brentt Michael Sherwood filed this direct appeal from the judgment of sentence of death and a lesser sentence entered by the Court of Common Pleas of Northumberland County following Appellant's conviction by a jury of first-degree murder,[1] aggravated assault,[2] and endangering the welfare of children.[3] We affirm the judgment of sentence.

1. 18 Pa.C.S. § 2502(a).

2. 18 Pa.C.S. § 2702(a)(1).

3. 18 Pa.C.S. § 4304.

The instant matter arose out of the beating death of Appellant's four year old step-daughter, Marlee Reed, on December 7, 2004. At about 1:00 p.m. that day, Appellant, who was home baby-sitting Marlee, called 911 and reported that she had passed out. When EMTs arrived, they observed that the child's skin showed cyanosis, and that she had significant bruising on her abdomen, chest, arms, legs, neck, and face, she did not have a discernible heartbeat, and was not breathing. The EMTs asked Appellant what had happened to the child and he told them that he had just awakened and found her in that condition. He then added that she had fallen. The EMTs tried, unsuccessfully, to revive the child for thirty minutes and then took her to Sunbury Community Hospital where additional efforts were made to revive her. Although doctors were able to restore some vital functions, Marlee did not regain consciousness. Marlee was then flown by helicopter to Geisinger Medical Center where she died the next morning having never regained consciousness.[4]

In addition to calling 911, Appellant had also telephoned his wife Heather Goodeliunas,[5] Marlee's mother, and told her that she had to come home immediately because Marlee was not breathing. Ms. Goodeliunas hurried home and as she entered the residence, Appellant began apologizing to her, saying repeatedly, "I'm so sorry baby." In addition, Ms. Goodeliunas received a telephone call from Appellant after he had been taken to police headquarters during which he stated, "Do you

4. When Marlee arrived at Geisinger Medical Center, she was in critical condition and underwent exploratory surgery which revealed that most of her internal organs had been damaged and that she had suffered several broken ribs. She had nineteen observable bruises and well over fifty discrete bruises according to one of the doctors who treated her. Many of the bruises on her arms were likely inflicted while Marlee was attempting to defend and protect herself from Appellant. The injuries she suffered, according to one of the doctors who treated her, were comparable to injuries seen in children ejected from automobiles travelling at sixty-five miles an hour. She lost so much blood that it could not clot and during the course of treatment she received several total blood transfusions.

5. After Marlee's death, her mother divorced Appellant and took back her maiden name.

think I would put myself at risk for going to jail for the rest of my life for manslaughter?"

Although Appellant never spoke to Ms. Goodeliunas again, he did send her letters. In a letter dated December 10, 2004, he wrote, "I am so sorry about what happened. I know that a million sorries wouldn't make up for what happened." Appellant added, "Right now I feel like the lowest piece of [expletive deleted] that I could ever think of, and rightfully so. I feel like I let you down." Appellant ended the letter by writing, "I hope I hear from you soon so I can explain myself."

Appellant told one of the first police officers to arrive at the scene on December 7, 2004, that he did not know what had happened to Marlee and remarked that an eight year old child had fallen on her a few days before.[6] Appellant then prepared a handwritten statement (the "handwritten statement") at the scene where he wrote that a ten-year old child had been carrying Marlee and had dropped her during a recent dinner party at Marlee's grandparents' residence. Appellant also wrote that Marlee had fallen off a small play table earlier that morning and had complained that she felt dizzy and had pains in her stomach. Appellant added that he entered the living room and panicked when he found Marlee unconscious. Appellant stated he immediately splashed some water on her and then placed her in the bathtub but when that failed to resuscitate her, he called 911.

After Appellant prepared this handwritten statement, police asked him if he would agree to go to the police station with them. Appellant agreed but asked during the ride to the station if he was under arrest. Police told him that he was not in custody. Appellant was not restrained during the ride to the police station.

6. Marlee had apparently been injured by an older child on December 4, 2004, while attending a party with her grandparents. They took her to a hospital emergency room on December 5, 2004, because she was complaining that her arm and elbow hurt. The doctor who examined Marlee found nothing seriously wrong with her and did not observe any bruises or other injuries on her body.

Police headquarters was located inside the borough hall and Appellant was placed in the borough hall meeting room, a large room having four doors located adjacent to police headquarters. When a tape recorder was brought into the room and Appellant was asked if he minded if the interview was tape recorded, Appellant affirmatively stated: "I feel like I should have an attorney." The interview ended immediately.

Approximately five minutes later, and after the chief of police was advised that Appellant had appeared to request the assistance of an attorney, an agent with the county's probation department asked to speak to Appellant, who was under county supervision for a previous drug conviction. Upon the arrival of a probation officer and two United States Marshals, Appellant was told that he was being detained because he had violated the rules of his supervision. Appellant then spoke to the probation officer.[7] Appellant told him that Marlee had fallen off a table. Appellant also said that the bruises observed on the child were not caused by him but were the result of her having been dropped by an older child at her grandparents' home a few days earlier. Appellant was then transported to county prison. At no time was Appellant given *Miranda*[8] warnings prior to being incarcerated.

On December 9, 2004, Corporal Richard Bramhall of the Pennsylvania State Police went to county prison to speak to Appellant. After the Corporal told Appellant that he considered Appellant's remark two days earlier about feeling as though he needed an attorney to be ambiguous and not a clear invocation of the right to counsel, the corporal administered *Miranda* warnings to Appellant. Appellant waived his *Miranda* rights and provided a statement wherein he admitted that he had beaten the child to death (the "December 9 Statement"). In the December 9 Statement, Appellant said that he was home watching Marlee and became angry because

7. Although Appellant successfully moved to suppress the incriminating statements he made to the probation officer at this time, Appellant called the probation officer as a defense witness and then elicited those same statements with respect to the possible causes of Marlee's injuries.

8. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

she said that she did not want to be there with Appellant.[9] As a result, he slapped the child in the face.

In the December 9 Statement, Appellant said that a couple of hours after he slapped Marlee, they watched a movie. Afterwards Marlee said to Appellant that she felt sorry for him. When he asked why, she said, "Because you're mean." Upon hearing Marlee's response, Appellant said he "snapped" and punched Marlee in the stomach with a closed fist and kicked her in her stomach or back, which caused her to fall to the floor. He then kicked her several times more in her stomach and back and also punched her as she lay on the floor. Marlee asked him to stop and tried to stand. She was unable to get to her feet and fell back to the floor where she was struck some more by Appellant. According to the December 9 Statement, Marlee eventually got up and ran into a bedroom where Appellant punched her again and caused her to fall; he continued to kick and punch her. The beating, Appellant stated, continued even though Marlee pleaded for him to stop.

According to Appellant, the beating lasted ten minutes in total and he stopped hitting Marlee a couple of times before again resuming his assault. Appellant had no explanation as to why he resumed the assault after twice stopping and indicated that when he finally ended the assault, he knew that he had "done something bad."

According to Appellant's December 9 Statement, Marlee stood up after the beating and Appellant picked her up and placed her on the living room couch. At various times she told him that she felt dizzy and that her stomach hurt. After 15–20 minutes, he noticed that she was no longer moving or breathing so he placed her lifeless body in a tub of cold water in an attempt to resuscitate her. When this failed to revive Marlee, Appellant took her from the tub, called 911, and began to perform CPR on her. Appellant admitted that he had used

9. Marlee had recently begun visiting her natural father which apparently caused friction in her relationship with Appellant; Appellant said in the December 9 Statement that Marlee's rejection of him hurt his feelings.

drugs the previous evening, but stated that he was not "high" when the beating occurred.

In addition to Appellant's various statements, there was additional evidence presented by the Commonwealth. Police obtained three search warrants for Appellant's residence. Those searches yielded various pieces of evidence containing blood spatter that was later tied to the victim.

Also, Ms. Goodeliunas testified at trial. She stated that she had left for work about 8:45 a.m. on December 7, 2004 and left Marlee in Appellant's care. At that time Marlee appeared to be fine. She admitted that she and Appellant had used illegal drugs the previous evening but that when she awakened Appellant that morning to tell him that he had to babysit Marlee, he did not appear to be under the influence of the drugs.

Following hearings on various motions, including a motion to suppress the statements Appellant gave to authorities and the physical evidence seized from Appellant's residence, which was granted in part and denied in part,[10] Appellant was tried before the Honorable Harvey Wiest of Northumberland County and a jury.

At trial, the Commonwealth introduced evidence showing that no one who had come in contact with Appellant on the day of the murder observed anything indicating that Appellant was under the influence of an intoxicating substance or that he was not in complete control of his faculties. Several people did observe bruises and other injuries to Appellant's hands.

An autopsy revealed that Marlee died from significant blunt force trauma that could have resulted from kicks and punches to her torso which caused extensive splenic lacerations, contusions of and bruises to her pancreas, kidney, small intestine, and liver and a laceration of the colonic mesentery with accompanying marked intra-abdominal hemorrhage. Other

10. Appellant's suppression motion was heard by the Honorable Samuel C. Ranck, Senior Judge of the Court of Common Pleas of Northumberland County (the "suppression court"). As noted above, the suppression court suppressed Appellant's comments to the probation officer.

injuries included multiple abrasions and contusions to her face and extremities and fractures of several ribs and a compression fracture of her seventh thoracic vertebral body. The injuries were consistent with her having been kicked and punched over a period of approximately ten minutes.

The Commonwealth also introduced evidence showing that Appellant struck Marlee on several occasions prior to December 7, 2004. Immediately following a few of these prior incidents, during which Marlee had been struck hard enough to cause her to bleed, Marlee told her mother, who was not present to witness them, that Appellant had given her a "knuckle sandwich."

Appellant testified in his own defense. After Appellant told the jury about the problems he had while attending school and his long-time abuse of alcohol and drugs, he testified about the day Marlee died. According to Appellant, after his wife left for work, he slapped Marlee because she stated that she did not want to be there with him. He then played with her for a while and had her watch a movie. When the movie ended, Marlee approached him and stated that she did not like him because he was mean. Appellant testified that he was hurt by the remark and began to strike her uncontrollably for about two and one half to three minutes at which time he regained control of himself and stopped striking her.

After he stopped hitting Marlee, Appellant, who testified that he was "really high," played on the computer for about an hour while thinking about remarks his wife had made to him before leaving for work concerning his failure to take responsibility for chores around the house. After playing on the computer, Appellant decided to give Marlee a bath. When she began asking Appellant why he was giving her a bath because he was not her father, Appellant again "lost it" and began hitting Marlee for about two and one half to three minutes. He then bathed her and when he finished and was drying her off, Marlee began repeating that Appellant was mean and was not her father. In response, Appellant testified, he began striking and kicking her again for approximately two and one half to three minutes. Although he realized that he had hurt

Marlee, Appellant testified that he did not believe that her injuries were serious because she did not lose consciousness.

Appellant then placed Marlee on the living room couch. When he observed that she had stopped breathing, he attempted to revive her by placing her in cold water. When that failed, he called 911. Appellant explained that he told authorities that Marlee had fallen and had been hurt the previous weekend because they were the first things that came to his mind. He testified that when he gave his statements, he had no recollection of the incident, and that as time passed he remembered more of it. He blamed the incident on a loss of control precipitated by Marlee's statements that she did not like him. Appellant testified that he did not intend to kill Marlee.

Appellant also introduced expert testimony that it was possible that he was suffering from a drug-induced psychosis at the time of the murder and that he was incapable of forming specific intent to kill at the time of the murder because of the combination of mental disorders and drug-induced intoxication.[11]

At the conclusion of the trial, the jury convicted Appellant of first-degree murder, aggravated assault, and endangering the welfare of children. At the penalty hearing the Commonwealth presented the aggravating circumstances related to the murder of a child under the age of twelve[12] and torture.[13] Appellant presented four mitigators: 1) he was under the influence of extreme mental and emotional disturbance;[14] 2) his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;[15] 3) his age;[16] and 4) the catch-all mitigator.[17]

---

11. The Commonwealth presented rebuttal testimony contradicting Appellant's claim that he was incapable of forming the specific intent to kill. One of the Commonwealth's experts described Appellant as acting with "purposeful rage."

12. 42 Pa.C.S. § 9711(d)(16).

13. 42 Pa.C.S. § 9711(d)(8).

14. 42 Pa.C.S. § 9711(e)(2).

15. 42 Pa.C.S. § 9711(e)(3).

16. 42 Pa.C.S. § 9711(e)(4).

17. 42 Pa.C.S. § 9711(e)(5).

The jury unanimously found both aggravating circumstances and no individual juror found any mitigating circumstance. As statutorily required, the jury sentenced Appellant to death. 42 Pa.C.S. § 9711(c)(1)(4).

Appellant was formally sentenced to death on July 30, 2007. In addition, the trial court imposed a consecutive sentence of three and one half to seven years incarceration and imposed a fine of $2500.00 on Appellant on the endangering welfare of children conviction.[18] Appellant, who did not file post-sentence motions, thereafter filed a notice of appeal in this Court.[19] At the behest of the trial court, Appellant thereafter filed a Pa.R.A.P.1925(b) statement.

In this appeal, Appellant asserts that he is entitled to relief because: 1) the evidence was insufficient to sustain his conviction for first-degree murder; 2) the verdict finding him guilty of first-degree murder was against the weight of the evidence; 3) the trial court erred in permitting the Commonwealth to introduce evidence of prior bad acts; 4) the suppression court erred in denying his motion to suppress his statements and the physical evidence seized by police; 5) there was no evidence of torture; 6) trial counsel was ineffective; and 7) a new trial should be granted on account of the number of errors extant in the trial. After careful review, we hold that Appellant is not entitled to relief on any of these claims.

In his first claim, Appellant contends that the verdict of first-degree murder is contrary to the weight and sufficiency of the evidence because Marlee's death was an accident that resulted from his loss of temper rather than from calm, cool reflection, and premeditation.[20] He also argues that because

18. No sentence was imposed on the aggravated assault conviction because the trial court determined that it merged, for sentencing purposes, with the first-degree murder charge.

19. See 42 Pa.C.S. § 722(4) and 42 Pa.C.S. § 9711(h)(1) (providing that this Court has exclusive jurisdiction over matters in which a sentence of death has been imposed).

20. Appellant does not challenge the weight and sufficiency of the evidence with respect to his convictions for aggravated assault or endangering the welfare of children.

no one witnessed the attack, we should assume as true the self-serving accounts of the incident he provided in the December 9 Statement, and his trial testimony, which Appellant submits do not support a first-degree murder conviction. Appellant's Supplemental Brief, 1–6. We address Appellant's sufficiency claim.

In the recent case of *Commonwealth v. Kennedy*, 598 Pa. 621, 959 A.2d 916, 921 (2008), this Court discussed a sufficiency claim with respect to a conviction for first-degree murder:

To obtain a first-degree murder conviction, the Commonwealth must demonstrate that a human being was unlawfully killed, the defendant perpetrated the killing, and the defendant acted with malice and a specific intent to kill. *See* 18 Pa.C.S. § 2501, 2502(a); *Commonwealth v. Sanchez*, 589 Pa. 43, 58, 907 A.2d 477, 486 (2006) (citing *Commonwealth v. Collins*, 550 Pa. 46, 50, 703 A.2d 418, 420 (1997)). When reviewing whether the evidence was sufficient to support a jury's findings to this effect, this Court determines whether the evidence, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to enable a reasonable jury to find every element of the crime beyond a reasonable doubt. *See Commonwealth v. Markman*, 591 Pa. 249, 269, 916 A.2d 586, 597 (2007) (citing *Commonwealth v. Watkins*, 577 Pa. 194, 208, 843 A.2d 1203, 1211 (2003)). In applying this standard, we bear in mind that the Commonwealth may sustain its burden by means of wholly circumstantial evidence; that the entire trial record should be evaluated and all evidence received considered, whether or not the trial court's rulings thereon were correct; and that the trier of fact, while passing upon the credibility of witnesses and the weight of the proof, is free to believe all, part, or none of the evidence. *See Commonwealth v. Cousar*, 593 Pa. 204, 217, 928 A.2d 1025, 1032–33 (2007); *Commonwealth v. Chmiel*, 585 Pa. 547, 574, 889 A.2d 501, 517 (2005).

In arguing this first claim, which rests upon a summary of the evidence cast in a light most favorable to himself, Appellant fails to discuss the elements of the crime of first-degree

murder, why the evidence did not establish each of those elements beyond a reasonable doubt, or how his conviction for first-degree murder violated his constitutional rights. Instead of proffering a proper sufficiency claim, Appellant instead makes assertions that correspond with an attack raising weight of the evidence claims. *See Commonwealth v. Dougherty*, 580 Pa. 183, 860 A.2d 31, 36 (2004) (holding sufficiency claim that "there is no credible evidence" is not sufficiency claim at all; it is a weight claim); *Commonwealth v. Small*, 559 Pa. 423, 741 A.2d 666, 672 (1999) (stating appellate court will not review sufficiency claim where argument in support of claim goes to weight, not sufficiency, of the evidence); *Commonwealth v. Mack*, 850 A.2d 690, 693 (Pa.Super.2004) (providing no relief where appellant alleged sufficiency but argued weight; weight issue was reserved for fact-finder below). Appellant's attack on weight rather than sufficiency is clear from the summary statement in his brief which states:

> Rarely, in a first degree murder where there is an intentional killing involving 'laying [sic] in wait' or a 'deadly weapon' does a murderer with such malicious and wicked heart call 911, administer CPR, and give mouth to mouth resuscitation. In fact such actions, all contradict the suggestion that there was a first degree, premeditated murder in this case. Thus, the only logical means by which the jury could render such a verdict was from sympathy and emotion that so overwhelmed them [sic] that they disregarded the subtle distinctions contained in Pennsylvania law.

Appellant's Brief, 11.

Although the failure to provide this Court with appropriate argument and citation to applicable legal authority usually results in waiver, *see Commonwealth v. Spotz*, 552 Pa. 499, 716 A.2d 580, 585 n. 5 (1998), "we have an independent obligation in all capital cases to review the sufficiency of the evidence supporting a first-degree murder conviction." *Commonwealth v. Montalvo*, 598 Pa. 263, 956 A.2d 926, 932 n. 5 (2008). *See also Commonwealth v. DeJesus*, 580 Pa. 303, 860 A.2d 102, 105 (2004). Thus, we will address the sufficiency of the evidence with respect to Appellant's conviction for first-degree murder.

■ We conclude that the evidence was sufficient to show Appellant's actions manifested a specific intent to kill, given the brutality of the assault and the fact that Appellant again began punching and kicking the victim after having stopped twice. A "specific intent to kill" is "the state of mind ... which accompanies a killing which was willful, deliberate and premeditated." *Commonwealth v. Ragan*, 560 Pa. 106, 743 A.2d 390, 400 (1999); *see also* 18 Pa.C.S. § 2502(d). Specific intent may be proven where the defendant knowingly applies deadly force to the person of another. *Commonwealth v. Hall*, 549 Pa. 269, 701 A.2d 190, 196 (1997), *cert. denied*, 523 U.S. 1082, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998). As stated by this Court in *Commonwealth v. Meredith*, 490 Pa. 303, 416 A.2d 481, 485 (1980):

Where one does not verbalize the reasons for his actions, we are forced to look to the act itself to glean the intentions of the actor. Where the intention of the actor is obvious from the act itself, the finder of fact is justified in assigning the intention that is suggested by the conduct. If a deadly force is knowingly applied by the actor to the person of another, the intent to take life is as evident as if the actor stated the intent to kill at the time the force was applied.

In addition, based on the number, type, and severity of the victim's injuries, the jury had sufficient evidence to find beyond a reasonable doubt that Appellant killed the victim with malice. *See Commonwealth v. Paquette*, 451 Pa. 250, 301 A.2d 837, 840 (1973) (indicating that fact-finder may infer malice from attending circumstances, such as the seriousness and type of injuries). *See also Commonwealth v. Williams*, 539 Pa. 61, 650 A.2d 420, 425 (1994) (holding that the same evidence used to prove specific intent to kill may be used to establish malice).

Here the evidence was sufficient to prove each of the elements constituting first-degree murder beyond a reasonable doubt. It established that Appellant punched and kicked a four-year old child in three separate vicious attacks over a ten minute period resulting in her death. Although Marlee pleaded with Appellant to stop, he ignored her and continued

his brutal assault causing irreversible damage to her vital organs, and those injuries were the proximate cause of her death. According to the doctor who conducted the autopsy, the force necessary to cause Marlee's injuries was significant. Evidence that Appellant punched and kicked Marlee repeatedly over a ten minute period enough times to cause severe injuries to her vital organs, fifty bruises, broken ribs and a fractured vertebra, was certainly sufficient to establish the crime of first-degree murder. *See Commonwealth v. Powell,* 598 Pa. 224, 956 A.2d 406, 416–417 (2008) (holding that "[t]he extensive physical injuries appellant inflicted on the child, his cold-hearted failure to timely seek medical assistance, and the contradictory explanations appellant offered as to how [the child-victim] sustained his injuries ... were sufficient to support the inference that appellant ... killed the victim intentionally, deliberately, and with premeditation").

With respect to Appellant's claim that, because he provided the only account of the incident, we should accept his version, the law is clear that "a jury or a trial Court can believe all or a part of or none of a defendant's statements, confessions or testimony." *Commonwealth v. Hornberger,* 441 Pa. 57, 270 A.2d 195, 198 (1970). *See also Commonwealth v. Palmer,* 448 Pa. 282, 292 A.2d 921, 923 (1972). Instantly, the jury had sufficient reason to reject Appellant's account, including the severity of Marlee's injuries, Appellant's numerous contradictory accounts about what caused those injuries, Appellant's allowing Marlee to lapse into unconsciousness, and Appellant's failure to seek immediate help for her following the incident.[21] Accordingly, we hold that the evidence was sufficient to sustain the conviction of first-degree murder.

21. That Appellant attempted to aid the child some twenty to thirty minutes after the beatings and only after the victim lapsed into unconsciousness does not negate specific intent to kill, as Appellant claims, because specific intent to kill is gauged at the moment of the killing and may be formed in a split second. *See, e.g., Commonwealth v. Drumheller,* 570 Pa. 117, 808 A.2d 893, 910 (2002) (noting that a "first-degree murder commences when the defendant possesses the specific intent to kill, takes some affirmative act to bring about the death of the victim, and the actions of the defendant eventually result in the death of the

■ Regarding Appellant's weight of the evidence claim we note that Appellant did not make a motion raising a weight of the evidence claim before the trial court as the Pennsylvania Rules of Criminal Procedure require. *See* Pa.R.Crim.P. 607(A).[22] The fact that Appellant included an issue challenging the verdict on weight of the evidence grounds in his 1925(b) statement and the trial court addressed Appellant's weight claim in its Pa.R.A.P 1925(a) opinion did not preserve his weight of the evidence claim for appellate review in the absence of an earlier motion. Pa.R.Crim.P. 607(A); *Steiner v. Markel,* 600 Pa. 515, 968 A.2d 1253, 1257 (2009) (holding that inclusion of an issue in a 1925(b) statement that has not been previously preserved does not entitle litigant to appellate review of the unpreserved claim); *Mack,* 850 A.2d at 694 (holding weight claim waived by noncompliance with Pa. R.Crim.P. 607, even if the trial court addresses it on the merits); *Commonwealth v. Burkett,* 830 A.2d 1034, 1037 (Pa.Super.2003) (same). *See also Commonwealth v. Little,* 879 A.2d 293, 300–301 (Pa.Super.2005), *appeal denied,* 586 Pa. 724, 890 A.2d 1057 (2005); *Commonwealth v. Washington,* 825 A.2d 1264, 1265 (Pa.Super.2003). Appellant's failure to challenge the weight of the evidence before the trial court deprived that court of an opportunity to exercise discretion on the question of whether to grant a new trial. Because "appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence," *Commonwealth v. Widmer,* 560 Pa. 308, 744 A.2d 745, 753 (2000), this Court has nothing to review on appeal. We thus hold that Appellant

victim"). Moreover, Appellant's actions could also be interpreted as constituting an attempt to hide his crime.

**22.** Pennsylvania Rule of Criminal Procedure 607(A) provides, in pertinent part: "A claim that the verdict was against the weight of the evidence shall be raised with the trial judge in a motion for a new trial: (1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion." Pa.R.Crim.P. 607(A). "The purpose of this rule is to make it clear that a challenge to the weight of the evidence must be raised with the trial judge or it will be waived." Pa.R.Crim.P. 607, Comment.

waived his weight of the evidence claim because it was not raised before the trial court as required by Pa.R.Crim. P. 607.[23]

In his next issue, Appellant argues that the trial court erred by permitting the Commonwealth to introduce, through Ms. Goodeliunas, evidence indicating that Appellant struck or abused Marlee on numerous occasions in the months prior to her death. Ms. Goodeliunas testified that in April 2004 she saw Marlee crying as Appellant held his hand over her mouth and ordered her to stop crying. N.T. 339–340. In May 2004, Ms. Goodeliunas saw Appellant kick Marlee hard enough in her stomach to cause her to fall. The blow left a black and blue mark on the child. N.T. 340–341. In August 2004, Ms. Goodeliunas encountered Marlee sitting on her bed with a bloody lip which she stated was caused by Appellant. N.T. 342. In September 2004, Ms. Goodeliunas found Marlee sitting on the couch with a bloody, swollen lip which Marlee attributed to Appellant who she said gave her a "knuckle sandwich." N.T. 344. Also that same month Ms. Goodeliunas saw Appellant push Marlee. N.T. 345. In November 2004, Ms. Goodeliunas saw a fresh cut under one of Marlee's eyes that she stated Appellant caused with a "knuckle sandwich." N.T. 346. Finally, in November 2004, Marlee told Ms. Goodeliunas that Appellant punched her in the stomach inducing her to vomit. N.T. 346.

Appellant asserts that the trial court should have excluded Ms. Goodeliunas's testimony about these incidents she did not directly witness and was only told about by Marlee because that evidence constituted inadmissible hearsay, was immaterial, irrelevant, "remote from time and place," prejudicial, and violative of Appellant's Sixth Amendment right of confrontation. Appellant further complains that all prior bad acts evidence, including incidents not witnessed by Ms. Goodeliunas, should not have been admitted because it was prejudicial, and Ms. Goodeliunas was an unreliable witness because she herself had been accused of abusing the victim and had

23. To the extent Appellant does present a "weight of the evidence" argument in his "sufficiency" claim, his argument nonetheless fails for the reasons stated by the trial court. Trial court's opinion, 13–15.

undergone psychiatric treatment in the year prior to the killing. Appellant's Brief, 11–15.

■ The admissibility of evidence is a matter for the discretion of the trial court and a ruling thereon will be reversed on appeal only upon a showing that the trial court committed an abuse of discretion. *Commonwealth v. Malloy*, 579 Pa. 425, 856 A.2d 767, 775 (2004); *Commonwealth v. Reid*, 571 Pa. 1, 811 A.2d 530, 550 (2002). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Commonwealth v. Dillon*, 592 Pa. 351, 925 A.2d 131, 136 (2007) (citation omitted). Having set forth the applicable standards of review, we will now address Appellant's various complaints with respect to the admission of this evidence.

■ First we consider Appellant's argument regarding Marlee's statements to her mother. Appellant complains that Ms. Goodeliunas's testimony concerning incidents she did not witness but which Marlee described to her constituted inadmissible hearsay and thus was inadmissible. Appellant's claim lacks merit because it is clear that Marlee's comments to her mother concerning the causes of her injuries were properly admitted under the "excited utterance" exception to the hearsay rule. Pa.R.E. 803(2). A statement made under the following circumstances is considered an excited utterance:

[A] spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person has just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties.... Thus, it must be shown first, that [the declarant] had witnessed an event sufficiently startling and so close in point of time as to render her reflective

thought processes inoperable and, second, that her declarations were a spontaneous reaction to that startling event. *Commonwealth v. Stokes*, 532 Pa. 242, 615 A.2d 704, 712 (1992) (*quoting Commonwealth v. Green*, 487 Pa. 322, 409 A.2d 371, 373–74 (1979))

■ This Court has determined that a hearsay remark is admissible under the excited utterance exception even if it was the product of questioning. *See Commonwealth v. Banks*, 454 Pa. 401, 311 A.2d 576, 580 (1973); *Commonwealth v. Edwards*, 431 Pa. 44, 244 A.2d 683, 685 (1968). Moreover, in determining whether a remark fits within this exception, a court must conduct a fact-specific inquiry and ascertain whether the remark was sufficiently contemporaneous to the startling event to be considered spontaneous. *Commonwealth v. Boczkowski*, 577 Pa. 421, 846 A.2d 75, 95–96 (2004). *See also Commonwealth v. Penn*, 497 Pa. 232, 439 A.2d 1154, 1159 (1982), *cert. denied, Penn v. Pennsylvania*, 456 U.S. 980, 102 S.Ct. 2251, 72 L.Ed.2d 857 (1982) (holding that child's statement was admissible under excited utterance exception even though statement was not made immediately after incident and was the product of questioning).

Instantly, Marlee's complaints and comments to her mother about incidents not witnessed by her mother were clearly made in response to a startling event, namely punches to her face and stomach. Moreover, Marlee was quite upset by the incidents and remained so as she reported them at her first opportunity, that is when she first saw her mother. In addition, the injuries caused by Appellant's blows to the victim's face in two of the incidents caused wounds that were still fresh and bleeding, evincing that the incidents had just occurred. Given these circumstances, we conclude that Marlee's statements to Ms. Goodeliunas were excited utterances and therefore admissible.

■ Appellant makes an additional claim regarding Marlee's statements to her mother premised on the Confrontation Clause of the Sixth Amendment.[24] In a one-sentence argu-

24. The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to ... be confronted with the witnesses against him."

ment, Appellant asserts that, "Any hearsay statement made by Marlee should be excluded, as the [Appellant] would be denied his federal and state right to confrontation." Appellant's Brief, 15. By failing to provide any discussion of the claim with citation to relevant authority, Appellant has waived review of this claim. *See Commonwealth v. Walter*, 600 Pa. 392, 966 A.2d 560, 566 (2009) (holding that failure to provide adequate discussion of issues raised and citation to supporting authority results in waiver of the issues); *Commonwealth v. Steele*, 599 Pa. 341, 961 A.2d 786, 798 n. 12 (2008) (holding that argument comprised of one sentence inadequate to preserve issue for review); *Commonwealth v. Puksar*, 597 Pa. 240, 951 A.2d 267, 293–294 (2008) (holding lack of development of argument fatal to claim).

We next consider Appellant's claim that all of the "prior bad acts" evidence allowed by the trial court should not have been admitted because it was immaterial, irrelevant, and prejudicial. Generally, evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity. Pa.R.E. 404(b)(1). However, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. Pa. R.E. 404(b)(2). In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact. *Commonwealth v. Powell*, 598 Pa. 224, 956 A.2d 406, 419 (2008). *See also Boczkowski*, 846 A.2d at 88.

Marlee's many complaints to her mother that Appellant hit her and Ms. Goodeliunas's testimony that she saw Appellant striking Marlee all were relevant to help establish the chain of events and pattern of abuse that eventually led to the fatal beating. *See Commonwealth v. Walker*, 540 Pa. 80, 656 A.2d 90, 98 (1995), *cert. denied*, 516 U.S. 854, 116 S.Ct. 156, 133 L.Ed.2d 100, (1995) ("[O]ur courts will allow evidence of prior bad acts where the distinct crime or bad act was part of a chain or sequence of events which formed the history of the

case and was part of its natural development.") (internal quotation marks omitted).

The challenged prior bad acts were also relevant to show intent, lack of mistake or accident, ill-will, malice, and the nature of Appellant's relationship with Marlee. In *Commonwealth v. Ulatoski*, 472 Pa. 53, 371 A.2d 186 (1977), this Court stated:

> [E]vidence concerning the previous relations between a defendant and a homicide victim is relevant and admissible for the purpose of proving ill will, motive or malice. Evidence of prior occurrences in which the accused threatened, assaulted, or quarreled with the decedent may be admissible for this purpose.

*Ulatoski*, 371 A.2d at 190 (footnotes omitted). *See also Commonwealth v. Cuevas*, 574 Pa. 409, 832 A.2d 388, 395 (2003). Under this case law it is clear that the admitted prior bad acts evidence was relevant because Appellant claimed at trial that he did not intend to kill Marlee and that he loved her. The prior bad acts evidence refuted these self-serving assertions. Thus, the ultimate admissibility of the evidence rests upon whether the probative value of the evidence outweighed its prejudicial effect.[25] We hold that it did because the trial court prevented the Commonwealth from introducing evidence of prior abuse that occurred more than nine months from the day of the murder. Moreover, the trial court gave the jury cautionary instructions concerning the prior bad acts evidence; the court advised the jury of the limited purpose for which the evidence was introduced and that they could not consider the evidence as proof that Appellant was a person of bad character or had criminal tendencies. N.T. 1392. We conclude that these instructions ameliorated any undue prejudice caused by the introduction of the prior bad acts. *See Commonwealth v. Claypool*, 508 Pa. 198, 495 A.2d 176, 179–180 (1985) (finding

**25.** Arguably, all evidence introduced by the Commonwealth is prejudicial. The admission of evidence becomes problematic only when its prejudicial effect creates a danger "that it will stir such passion in the jury as to sweep them beyond a rational consideration of guilt or innocence of the crime on trial." *Ulatoski*, 371 A.2d at 192 n. 11 (citation omitted).

that giving of cautionary instructions was sufficient to over-
come prejudicial effect of introduction of prior bad acts evi-
dence).

Appellant also argues that the prior bad acts evidence
should not have been admitted because Ms. Goodeliunas was
an unreliable witness who had a motive to accuse Appellant of
abusing Marlee, namely, to hide her own abuse of the child.
This complaint goes to the weight of the evidence and not its
admissibility. Consequently, we reject Appellant's argument
on this claim.

In his next issue Appellant complains that the sup-
pression court erred by denying his motion to suppress his
oral and handwritten statements made to authorities on De-
cember 7, the December 9 Statement, and the physical evi-
dence seized by police from his residence pursuant to three
search warrants. We will first discuss the claims related to
the various statements.[26]

With respect to the oral and written statements Appellant
made at the scene when police first arrived on December 7,
Appellant claims that he was in custody because a police
officer testified at his suppression hearing that Appellant
would not have been permitted to leave had he attempted to
do so. Therefore, Appellant argues, he should have been
given *Miranda* warnings before police spoke to him at the
scene.

Regarding the December 9 Statement, Appellant argues
that his Sixth Amendment right to counsel was violated.
Appellant claims he invoked his right to counsel when he said
to police on December 7, "I feel like I should have an
attorney." Citing *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct.
1880, 68 L.Ed.2d 378 (1981), Appellant argues that because he
did invoke his right to counsel at that time, police could no
longer interview him unless he initiated a conversation with

26. In reviewing the denial of a motion to suppress evidence our review
is limited to determining whether the facts determined by the suppres-
sion court are supported by the record and its legal conclusions drawn
therefrom are correct. *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d
831, 842 (2003).

police or until the police supplied him with an attorney. He further argues that the suppression court applied the wrong standard in holding that Appellant's reference to counsel on December 7 was too equivocal to conclude that it manifested a request for counsel.

Although Appellant's arguments conflate his Fifth and Sixth Amendment claims and do not differentiate between the various statements he gave, it appears that Appellant is first claiming that the statements he made while still at the scene should have been suppressed because he was in custody and they were not preceded by *Miranda* warnings. The record shows, however, that Appellant advised the suppression court that he was not challenging the admissibility of these statements. N.T. 12/19/05, 13. Thus, Appellant is entitled to no relief on this claim.

Appellant's Sixth Amendment claim regarding the December 9 Statement rests upon the assertion that he was in custody when he stated on December 7 at the borough hall, "I feel like I should have an attorney." Thus, Appellant argues that Corporal Bramhall violated his Sixth Amendment right to counsel when he interviewed him on December 9 without an attorney and without Appellant's initiating the interview.

The suppression court ruled that Appellant was not in custody at the time he made the statement about an attorney. At no time was he restrained in any manner while at the scene, in the police car riding to the borough hall, or at the police station. The suppression court also noted that police specifically told Appellant that he was not under arrest, that Appellant voluntarily accompanied police to the police station and that police placed him unrestrained, in a large room with four exits. Suppression court's opinion, 5–6.

The test for custody is an objective one that focuses on the reasonable impression conveyed by the actions of the police to the person being questioned. In *Commonwealth v. Pakacki*, 587 Pa. 511, 901 A.2d 983, 987–988 (2006), this Court stated:

In determining whether an encounter with the police is custodial, "[t]he standard ... is an objective one, with due consideration given to the reasonable impression conveyed to the person interrogated rather than the strictly subjective view of the troopers or the person being seized ..." and "must be determined with reference to the totality of the circumstances." *Commonwealth v. Edmiston*, 535 Pa. 210, 634 A.2d 1078, 1085–86 (1993). *Miranda* warnings are required only when a suspect is in custody. *Commonwealth v. Ford*, 539 Pa. 85, 650 A.2d 433, 439 (1994). As this Court has noted:

> A person is in custody for *Miranda* purposes only when he "is physically denied his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation." *Commonwealth v. Johnson*, 556 Pa. 216, 727 A.2d 1089, 1100 (1999). The U.S. Supreme Court has elaborated that, in determining whether an individual was in custody, the "ultimate inquiry is ... whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994).

*Commonwealth v. Boczkowski*, 577 Pa. 421, 846 A.2d 75, 90 (2004) (footnote and parallel citations omitted).

Since Appellant was not subject to conditions which would have conveyed to a reasonable person that he was not free to leave before he was taken into custody by probation authorities on December 7, it is clear that *Miranda* warnings were not required either at the scene or prior to his being taken into custody.

Appellant nonetheless claims that the suppression court erred in finding that he was not in custody prior to being detained by probation authorities because a police officer testified that Appellant would have been restrained if he attempted to leave. We reject Appellant's argument because the question of whether an individual is in custody is governed by an objective test; the subjective intent of a police officer is

irrelevant in determining whether a person is in custody. *See Pakacki, supra. See also Commonwealth v. Gibson,* 553 Pa. 648, 720 A.2d 473, 480 (1998) (holding that the test for custodial interrogation does not depend on the subjective intent of the police); *Commonwealth v. Williams,* 539 Pa. 61, 650 A.2d 420, 427 (1994) (same).[27]

 The next question is whether Appellant's statement, "I feel like I should have an attorney," was sufficiently specific to trigger his right to counsel under both the Fifth and Sixth Amendments. The suppression court held that because Appellant was not in custody when he made the remark, he was not entitled to counsel under the Fifth Amendment. Suppression court's opinion, 5–6. This ruling comports with the law which provides that one cannot anticipatorily invoke the Fifth Amendment right to counsel, as recognized by the *Miranda* decision, and that *Miranda* applies only after one is placed in custody. *See Commonwealth v. Romine,* 453 Pa.Super. 42, 682 A.2d 1296 (1996). In *Romine,* the Superior Court stated:

Finally, as the Commonwealth points out, the Fifth Amendment right to counsel cannot be invoked anticipatorily outside of the context of custodial interrogation:

[The U.S. Supreme Court has] in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than "custodial interrogation".... If the Miranda right to counsel can be invoked at a preliminary hearing, it could be argued, there is no logical reason why it could not be invoked by a letter prior to arrest, or indeed even prior to identification as a suspect. Most rights must be asserted when the government seeks to take the action they protect against. The fact that we have allowed the *Miranda* right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be

27. The suppression court did suppress the statements Appellant made to the probation officer on December 7 based on a finding that Appellant was in custody and had not been given *Miranda* warnings prior to the initiation of interrogation by the probation officer. Suppression court's opinion, 7–9.

asserted initially outside the context of custodial interrogation, with similar future effect.

*McNeil,* 501 U.S. at 182 n. 3, 111 S.Ct. at 2211 n. 3.

*Romine,* 682 A.2d at 1302. *See also Commonwealth v. Morgan,* 416 Pa.Super. 145, 610 A.2d 1013, 1016 (1992) (holding that the exercise of *Miranda* rights need not be honored when a defendant is not in custody). Since Appellant was not in custody when he made his statement about a lawyer, his alleged invocation of his right to counsel had no Fifth Amendment effect and thus police had no obligation to provide him with counsel, or to desist from interviewing him until they provided him with counsel.

▮ Appellant's claim that his Sixth Amendment right to counsel was violated because counsel was not provided after he stated, "I feel like I should have an attorney," also lacks merit. Although it appears that Appellant's remark did constitute a valid request for counsel, *see Commonwealth v. Fears,* 575 Pa. 281, 836 A.2d 52, 61 (2003) (holding that police must provide counsel whenever a defendant makes a statement that can be construed "to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by police") (*quoting McNeil v. Wisconsin,* 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158, (1991)), Appellant is not entitled to relief predicated on a violation of the Sixth Amendment right to counsel.

When Appellant requested counsel, formal charges had not yet been brought with respect to Marlee's murder. Thus, since the Sixth Amendment right to counsel is offense specific, and Appellant was not charged with Marlee's death until after he was interviewed on December 9 by Corporal Bramhall, Appellant's Sixth Amendment right to counsel had yet to attach. *See McNeil, supra* ("The Sixth Amendment right ... is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, "at or after the initiation of adversary judicial criminal proceedings-whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."). *See also Boczkowski,* 846 A.2d at 92–93 (hold-

ing that since defendant was not in custody when he made inculpatory gestures, his *Edwards* claim necessarily fails); *Commonwealth v. Karash*, 513 Pa. 6, 518 A.2d 537, 541 (1986) (holding that Sixth Amendment right to counsel cannot be invoked prior to initiation of adversarial judicial proceedings). Accordingly, we find no merit to Appellant's claims that the suppression court erred in denying his motion to suppress the December 9 Statement.

We turn now to Appellant's challenge to the denial of his motion to suppress those items seized by police via three search warrants. Appellant argues that the suppression court erred by refusing to suppress all physical evidence seized by police from his residence because of an alleged defect in two of the three search warrants police executed at the residence. He first claims that the affidavits of probable cause attached to the first and third warrants [28] were defective because they failed to establish the "reliability" of Ms. Goodeliunas, who Appellant asserts, should be considered an informant. Appellant contends that absent indicia establishing Ms. Goodeliunas's reliability, the affidavits failed to establish probable cause.

Appellant further claims that the affidavit of probable cause appended to the first search warrant was defective because it was too broad and permitted police to conduct a "fishing expedition." Finally, Appellant claims that items seized pursuant to the second and third warrants should be suppressed pursuant to the "fruit of the poisonous tree" doctrine because their issuance was predicated on items seized by police pursuant to the first allegedly defective warrant.

▮▮▮ Appellant's claim that the affidavits attached to the first and third warrants did not establish probable cause because they did not demonstrate that Ms. Goodeliunas was reliable is premised on a request that this Court reverse

28. Police obtained the first search warrant on December 7, 2004. Based on items seized during the execution of that warrant, police obtained a second warrant on December 8, 2004. Police also obtained the third warrant on December 8.

*Commonwealth v. Gray*, 509 Pa. 476, 503 A.2d 921 (1985) [29] and readopt the standards set forth in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). *Aguilar* and *Spinelli* required an affiant to set forth "both the informant's basis for his knowledge and independent facts showing the reliability of the informant," *see Gray*, 503 A.2d at 924, in order to obtain a search warrant predicated on information obtained from a confidential informant. Appellant submits that if this two-part *Aguilar/Spinelli* test is applied to the affidavits under scrutiny herein, he would be entitled to relief because the affidavits failed to establish Ms. Goodeliunas's reliability.

We decline Appellant's invitation to overturn *Gray*. As this Court noted in *Gray*, "the totality of the circumstances approach is more in line with the current state of the law." *Gray*, 503 A.2d at 922.[30] Since Appellant has failed to present anything to contradict or undermine this observation or convince us that we should no longer apply the "totality of circumstances" test to affidavits of probable cause, Appellant is not entitled to relief with respect to this claim.[31]

**29.** In *Gray*, this Court adopted the "totality of circumstances" test established by the United States Supreme Court in *Gates v. Illinois*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) as the standard for determining whether a warrant dependent on information obtained from a confidential or anonymous informant established probable cause under Article 1, section 8 of the Pennsylvania Constitution.

**30.** Although a majority of the states have adopted the *Gates* test, upon which *Gray* is premised, not every state has done so. *See, e.g., State v. Jones*, 706 P.2d 317 (Alaska 1985); *Commonwealth v. Upton*, 394 Mass. 363, 476 N.E.2d 548 (1985); *State v. Cordova*, 109 N.M. 211, 784 P.2d 30 (1989); *People v. Griminger*, 71 N.Y.2d 635, 529 N.Y.S.2d 55, 524 N.E.2d 409 (1988); *State v. Jacumin*, 778 S.W.2d 430 (Tenn.1989); *State v. Jackson*, 102 Wash.2d 432, 688 P.2d 136 (1984).

**31.** Even if we were inclined to grant the relief Appellant seeks, he still would not be entitled to relief under the *Aguilar/ Spinelli* test because Ms. Goodeliunas was not an informant, but rather a known witness, and thus her reliability or lack thereof was not in issue with respect to the question of whether the search warrant contained sufficient information to establish probable cause. Given the other information contained in the affidavits apart from the information provided by Ms. Goodeliunas, the probable cause in this warrant was ample.

Furthermore, the affidavit of probable cause attached to the first warrant, viewed under the appropriate "totality of circumstances" test, plainly contained sufficient facts to establish probable cause. This affidavit provided:

Your affiant has been employed by the Northumberland Police Department, Northumberland, Pennsylvania for the past 8 years. I am empowered to conduct investigations into violations of various laws of the Commonwealth of Pennsylvania. During the course of employment, I have been involved in numerous Criminal and Drug related investigations. These investigations have lead to the application of search and arrest warrants that have lead to the conviction of those involved.

On 12-7-04 at 1330 hours, Officer Vognetz of this department was dispatched to the rear of 444 Front Street in this borough for a unresponsive 4 year old juvenile. Officer Vognetz arrived on scene at 1332 hours and contacted this officer and was asked to respond with a camera. Officer Vognetz advised this officer that bruising was observed on the childs [sic] torso area and that EMS was currently working on the child.

This officer then arrived on scene and observed the four year old child laying [sic] on the dining room floor while EMS personnel were attempting to revive her. This officer observed bruising on the child's stomach and chest area.

Officer Vognetz stated that he spoke with Brentt Michael Sherwood, stepfather of the 4 year old child who was identified as Marlee Reed and that he was alone at home with the child. Vognetz stated that Brentt told him that he was in the bathroom and came out to find the child laying [sic] on the floor. Brentt then stated that he picked up the child took her to the bathroom to attempt to get water on her. Brentt stated that he then called 911 on his cell phone, was later observed talking to his wife on his cell phone. Brentt stated a short time later in a Victim/Witness statement that prior to finding Reed on the floor, she was in her room and climbing onto a table and then fell. Brentt stated

that Reed was then complaining about being dizzy and having a stomach ache.

Lou Ebersole, Jr. (EMT for Area Ambulance) stated that he heard Brentt stated that he was sleeping and woke up to find the child in the condition she was in.

Jay Zalewski (Paramedic for Area Ambulance) stated the he observed the 4 year old female laying [sic] in the middle of the room on her back and not clothed. Zalewski then stated that the child was pale and cyanotic in the face. Zalewski stated that he immediately observed bruising to the child's body. Zalewski stated that the child had a bruise on the left side of her face, just below the eye. Zalewski stated that these injuries were being surveyed as CPR was initiated, a bruise was also noticed on the right side of her neck and to the upper chest and abdomen. Zalewski stated that bruising was observed to the middle of the chest on the child and across the chest area. Also observed were small bruises to the legs, arms and to the left of her groin area. Sergeant Kriner and Officer Vognetz interviewed Heather Sherwood (mother of child) at Geisinger Hospital and Heather Sherwood stated that there has been abuse in the past to her daughter that was caused by Brentt. Heather stated that Brentt smokes dope and she prefers that he does because he is mellow when he smokes it. Heather stated that about a month ago, Brentt punched the child in the stomach hard enough to make her vomit and then punched her in the mouth causing her to bleed and Brentt wiped the blood away. Heather stated that she also noticed a cut on her cheek under one of her eyes as well. Heather then stated that she bathed the child last night and did not observe bruising.

Michael Potteiger (Chief Northumberland County Adult Probation officer) stated that while interviewing Brentt he noticed bruising on his right hand area.

In *Commonwealth v. Torres*, 564 Pa. 86, 764 A.2d 532 (2001), this Court set forth the standards by which affidavits of probable cause are scrutinized for purposes of ascertaining whether they establish probable cause:

Pursuant to the "totality of the circumstances" test set forth by the United States Supreme Court in *Gates,* the task of an issuing authority is "simply to make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Commonwealth v. Gray,* 509 Pa. 476, 484, 503 A.2d 921, 925 (1985) (*quoting Gates,* 462 U.S. at 238–39, 103 S.Ct. at 2332). Thus, the totality of the circumstances test "permits a balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tip...." *Gates,* 462 U.S. at 234, 103 S.Ct. at 2330. It is the duty of a court reviewing an issuing authority's probable cause determination to ensure that the magistrate had a substantial basis for concluding that probable cause existed. *Gray,* 509 Pa. at 484, 503 A.2d at 925. In so doing, the reviewing court must accord deference to the issuing authority's probable cause determination, and must view the information offered to establish probable cause in a common-sense, non-technical manner. *Commonwealth v. Jones,* 542 Pa. 418, 668 A.2d 114, 117 (1995) (opinion announcing the judgment of the Court).

*Torres,* 764 A.2d at 537–538.

Instantly, a review of the above affidavit demonstrates that it contained sufficient information to establish probable cause. The affidavit outlined that a four year old child had been found unconscious under suspicious circumstances inside the residence, that the injuries observed on the child's body were numerous and severe, that Appellant had given many contradictory versions of what had occurred to the child to cause her injuries, and that the child's mother accused Appellant of having recently abused the child. When viewed together these facts certainly established probable cause to search the residence.

 Appellant's assertion that the descriptions which were contained in the first and third search warrants of the items

sought by police were overly broad, and thus illegal, is meritless. The affidavit attached to the first search warrant described the items police were seeking as follows:

Any and all evidence which caused or are related to the injuries sustained to a four year old female child, Marlee Reed, including but not limited to implements that could have caused injury, items of clothing or furniture which may contain evidence of injuries to the child and the body of the suspect (Brentt Michael Sherwood) for injuries he may have sustained, and the suspects [sic] cellular phone for any and all phone calls made around the time of call 1327 hours.

The third warrant sought the following items:

Any and all evidence which caused or are [sic] related to the injuries sustained to a four year old female child, Marlee Reed, including but not limited to implements that could have caused injury. In particular, any video tapes, photographs, including still photographs, negatives, compact disc's [sic] (CD's), films, undeveloped film and the contents therein, digital camera, digital media and computer. And any books, papers, & notes and any items associtaed [sic] with this crime not excluding any items which may be related to any sexual offense and/or acts including any condoms or gratification devices such as dildos and/or vibrators.

This Court recently had the occasion to address a similar claim in *Commonwealth v. Rega,* 593 Pa. 659, 933 A.2d 997, 1012–1013 (2007). Justice Baer wrote:

A search warrant cannot be used as a general investigatory tool to uncover evidence of a crime. *In re Casale,* 512 Pa. 548, 517 A.2d 1260, 1263 (1986); *Commonwealth ex rel. Ensor v. Cummings,* 416 Pa. 510, 207 A.2d 230, 231 (1965). Nor may a warrant be so ambiguous as to allow the executing officers to pick and choose among an individual's possessions to find which items to seize, which would result in the general "rummaging" banned by the Fourth Amendment. *See Commonwealth v. Santner,* 308 Pa.Super. 67, 454 A.2d 24 (1982) (*quoting Marron v. United States,* 275

U.S. 192, 195, 48 S.Ct. 74, 72 L.Ed. 231 (1927)). Thus, Pa.R.Crim.P. 205 specifies the necessary components of a valid search warrant. The comment to Rule 205 provides, however, that even though general or exploratory searches are not permitted, search warrants should "be read in a common sense fashion and should not be invalidated by hypertechnical interpretations. This may mean, for instance, that when an exact description of a particular item is not possible, a generic description will suffice." Pa. R.Crim.P. 205 (cmt.).

*Rega*, 933 A.2d at 1011–1012.

Here, the suppression court determined that the warrants were not overbroad because they described the items police were seeking as nearly as possible under the circumstances. Suppression court's opinion, 11–12. We agree, as the warrants were limited to those items that likely might contain evidence related to the crime. Moreover, since the evidence police were seeking included evidence of physical injury, the warrant had to be sufficiently broad to encompass all of the items that possibly could contain material of evidentiary value. In *Commonwealth v. Matthews*, 446 Pa. 65, 285 A.2d 510 (1971), which is cited by the suppression court in its opinion, this Court stated that "where the items to be seized are as precisely identified as the nature of the activity permits and an exact description is virtually impossible, the searching officer is only required to describe the general class of the item he is seeking." 285 A.2d at 514. We affirm these principles here and deny Appellant relief with respect to this claim because of the nature of the injuries to the child and the fact that evidence related thereto, such as blood spatter, could be found in numerous places throughout the residence.

Since we have concluded that the first search warrant was valid, it is clear that Appellant's claim that the second and third warrants were invalid because they relied on evidence seized during the execution of an invalid first warrant lacks merit. Thus, Appellant's "fruit of the poisonous tree" claim fails. Accordingly, we reject Appellant's numerous claims

related to the denial of his motion to suppress his statements and the physical evidence seized by police.

In his next issue Appellant argues that there was no evidence of torture, the trial court erred in instructing the jury on torture, and the Northumberland County District Attorney's Office engages in systematic abuse of its authority because it contends in every homicide case arising in the County that torture is an aggravating circumstance. Appellant also asserts that the evidence was insufficient to prove torture because it failed to establish that it was Appellant's intent to cause the victim considerable pain beyond that necessary to kill her and she was not subjected to torture as that term is generally used.

Appellant's claim that the trial court's charge on torture was deficient rests upon a contention that the trial court failed to give the instruction of torture set forth in the Standard Jury Instructions and instead merely defined the word "torture" for the jury. Appellant is not entitled to relief with respect to this claim because he failed to object to the instruction given by the trial court before the trial court sent the jury out to begin deliberations. The law is clear that in order to preserve a claim predicated on an allegedly erroneous jury instruction, a litigant must raise an objection before the jury retires to deliberate. Pa.R.Crim.P. 647(B).[32] A review of the transcript of the sentencing hearing indicates that Appellant did not proffer an objection and thus waived review of this claim under Rule 647(B). *See also Montalvo*, 956 A.2d at 935–936.

Appellant's claim that the evidence was insufficient to establish that it was his intent to torture the victim and to establish that the victim was killed by means of torture is also meritless. First, the evidence was sufficient to establish torture. In *Powell*, 956 A.2d at 424–426, a case involving the beating death of a six-year old child who had been abused by the defendant for a long period of time prior to the day of the

[32]. Pa.R.Crim.P. 647(B) provides that "[n]o portions of the charge nor omissions therefrom may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate. All such objections shall be made beyond the hearing of the jury."

murder, this Court addressed a similar claim. The Court held that evidence demonstrating a history of abuse coupled with evidence showing that the defendant again struck the child-victim after having ceased the assault was sufficient to establish "torture," defined as intent to cause "considerable pain and suffering that was unnecessarily heinous, atrocious, or cruel, manifesting exceptional depravity." *Powell*, 956 A.2d at 425 (*quoting Commonwealth v. Karenbauer*, 552 Pa. 420, 715 A.2d 1086, 1099 (1998), *cert. denied*, 526 U.S. 1021, 119 S.Ct. 1258, 143 L.Ed.2d 354, (1999)). This Court then stated:

> "Implicit in subsection 8 is the requirement of an intent to cause pain and suffering in addition to the intent to kill." *Karenbauer*, 715 A.2d at 1099 (internal quotation marks omitted). The intent to torture may be proven from the circumstances surrounding the killing. *Cox*, 686 A.2d at 1289. This Court has listed the factors to be considered in determining whether the torture aggravator applies as including, but not limited to: (1) the manner in which the murder was accomplished, including the number and type of wounds inflicted; (2) whether the wounds were inflicted on a vital or non-vital area of the body; (3) whether the victim was conscious when the wounds were received; and (4) the duration of the episode. *Commonwealth v. Ockenhouse*, 562 Pa. 481, 756 A.2d 1130, 1137 (2000). In reviewing a jury's finding of torture, this Court examines the evidence in the light most favorable to the Commonwealth, and draws all reasonable inferences in its favor. *Commonwealth v. Buehl*, 510 Pa. 363, 508 A.2d 1167, 1181 (1986).

*Powell*, 956 A.2d at 425.

Instantly, the beating herein occurred in three separate episodes over a ten minute period. Each beating lasted between two and three minutes and involved the infliction of numerous kicks and punches to the diminutive body of the victim such that she sustained catastrophic injuries to her vital organs resulting in severe internal bleeding that eventually killed her. In total over fifty discrete bruises were detected on Marlee's body which evinces that it was Appellant's conscious wish to cause her substantial and unnecessary pain.

*See Karenbauer,* 715 A.2d at 1099–1100 (holding that evidence of infliction of numerous blows on child-victim, none of which was alone fatal, was sufficient to establish torture).

Appellant also manifested his intent to inflict unnecessary pain on Marlee by chasing after her when she tried to escape him and again resuming his vicious assault upon her when he caught her. Appellant ignored Marlee's complaints that her stomach hurt. By permitting her to lie on the couch while complaining of pain without seeking medical assistance for her, Appellant further demonstrated that it was his intent to cause her unnecessary pain and suffering. Marlee was conscious throughout each of the three beating episodes and only lost consciousness following the last beating after Appellant placed her on the couch.

In addition, the evidence established that Appellant had beaten the victim on several previous occasions thereby showing that he had a great dislike for the child that culminated in her death. Finally, given the size disparity between the victim and Appellant, one can infer that it was Appellant's intent to "torture" the victim as he easily could have killed her with one quick blow. *See Karenbauer,* 715 A.2d at 1099–1100. The evidence was certainly sufficient to establish that the killing was committed by means of torture and that Appellant intended to inflict pain beyond that necessary to kill the victim. *See Powell, supra; Karenbauer, supra.* Appellant's claims with respect to torture merit no relief.[33]

Appellant's claim that the Northumberland District Attorney engaged in bad faith by charging that the killing herein

---

**33.** Were we to hold that the evidence was insufficient to prove torture, Appellant would not be entitled to a new penalty hearing because the jury found two aggravators and no mitigators. Consequently, even if it were determined that Appellant's claims concerning the torture aggravator were meritorious, Appellant would not receive a new penalty hearing because the jury found an additional aggravating circumstance and no juror found any mitigating circumstance. *See Powell, supra;* (holding that sentence of death is required if the jury found at least one aggravator and no juror found a mitigating circumstance); *Commonwealth v. Maxwell,* 534 Pa. 23, 626 A.2d 499, 502 (1993) (same); *Commonwealth v. Morales,* 508 Pa. 51, 494 A.2d 367, 376–377 (1985) (same).

was committed by torture, lacks merit because the evidence adduced during the penalty hearing was sufficient to prove torture. We thus deny Appellant relief with respect to this claim.[34]

 Next, Appellant raises numerous claims alleging ineffective assistance of prior counsel, all of which he presents for the first time in this direct appeal.[35] We decline to review any of them pursuant to *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726, 738 (2002), wherein this Court held that "as a general rule, a petitioner should wait to raise claims of ineffective assistance of counsel until collateral review." *See Commonwealth v. Pagan*, 597 Pa. 69, 950 A.2d 270, 287 (2008) (holding that without a hearing on any ineffectiveness claim appellate court lacks factual basis to review claim).

In his final claim, Appellant argues that he is entitled to relief because the "errors and omissions of record were so material and harmful to elemental due process that [this Court] as an institution cannot ignore them as a matter of law." This Court has repeatedly held that "no number of failed claims may collectively warrant relief if they fail to do so individually." *Commonwealth v. Washington*, 592 Pa. 698, 927 A.2d 586, 617 (2007). *See also Commonwealth v. Tedford*, 598 Pa. 639, 960 A.2d 1, 56 (2008). Therefore, this claim fails.

Having found that Appellant is not entitled to relief on any of his properly preserved claims, we are now statutorily required to conduct a review of the death sentence, which we are required to affirm, unless we determine that 1) the sentence of death was the product of passion, prejudice, or any other arbitrary factor; or 2) the evidence fails to support the finding of at least one aggravating circumstance. 42 Pa.C.S. § 9711(h)(3).

34. Appellant has failed to provide any proof for the bald assertion proffered here that the Northumberland County Prosecutor's Office charges torture as a matter of course in every homicide case brought in the County despite a lack of evidentiary support.

35. Appellant was represented by Brian V. Manchester, Esquire, during the hearing on Appellant's Omnibus Pretrial Motions and at trial by R. Bruce Manchester, Esquire.

Upon a careful and intensive review of the entire record certified to this Court, we hold that the evidence was sufficient to support both aggravating factors found by the jury. Certainly, the evidence was sufficient to establish that Marlee was under the age of twelve when she was murdered. And, as discussed above, the evidence was more than sufficient to sustain the torture aggravator. Finally, we are also satisfied that the jury's sentence of death was not the product of passion, prejudice, or any other arbitrary factor, but was based upon the evidence presented at trial.

Accordingly, we affirm the judgment of sentence and dismiss Appellant's claims of ineffectiveness of trial counsel without prejudice to Appellant's right to raise those claims on collateral review under the PCRA.[36]

Chief Justice CASTILLE, and Justice EAKIN and BAER, Justice TODD and Justice McCAFFERY join the opinion.

Justice SAYLOR concurs in the result.

---

**36.** The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).