J-S05023-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| TOMAS MCWATERS | : | |
| | : | |
| Appellant | : | No. 1059 EDA 2020 |

Appeal from the Judgment of Sentence Entered February 21, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0000487-2019

BEFORE: BOWES, J., LAZARUS, J., and McLAUGHLIN, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED APRIL 27, 2021**

Tomas McWaters appeals from the judgment of sentence, entered in the Court of Common Pleas of Philadelphia County, following his convictions, after a non-jury trial, of strangulation,[1] simple assault,[2] and recklessly endangering another person (REAP).[3] McWaters challenges the weight and sufficiency of the evidence to support his convictions. Upon careful review, we affirm.

This case arises from an altercation that occurred between McWaters and the complainant, Yavah Briggs, on November 1, 2018. The trial court summarized the facts as follows:

> [McWaters] and [Briggs] [] were once romantic partners who share a child. On the afternoon of November 1, 2018, [Briggs]

---

[1] 18 Pa.C.S.A. § 2718(a)(1).

[2] 18 Pa.C.S.A. § 2701(a).

[3] 18 Pa.C.S.A. § 2705.

was living with [McWaters] at 1735 North 53rd Street in the City and County of Philadelphia. After entering the house and greeting Malcolm, [McWaters'] grandmother's boyfriend and Mikkell Brooks, [McWaters'] Uncle ("Brooks"), [Briggs] went upstairs and tried to open the door to [McWaters'] bedroom as she "normally would." [Briggs] found the door locked and called to [McWaters] to open it. [McWaters] asked who was there, and [Briggs] responded that she had their baby and wanted to set the child down to avoid dropping her. From behind the locked door, [Briggs] heard the voice of Chanelle Adechokan [], whom she knew from their work together in the army. [Briggs] told [McWaters] she did not "care what [he was] doing" and to "just let [her] come in and get [her] things and set the baby down." [Briggs] heard the door unlock, and when she attempted to open it, someone was pushing back against it. [Briggs] worked her foot between the crack of the door and reminded [McWaters] for a third time that all she wanted was to set their baby down and get her bag. [McWaters] pushed back on the door with so much force that [Briggs] shouted that she was worried [McWaters] would break her foot. Adechokan told [Briggs] to wait "a damn minute[]," and continued to hold the door to prevent [Briggs] from entering.

When [McWaters] and Adechokan pushed back on the door again, [Briggs] nearly dropped her baby. Consequently, [Briggs] and Adechokan got into a verbal and physical altercation through the small crack in the door. In response, [McWaters] swung his arm through the crack and punched [Briggs] in the face. After [Briggs] finally struggled her way into the room to get her things, she managed to set down their baby on [McWaters'] bed just before [McWaters] "charged at [her]" and shoved her into the closet where she fell into a pile of wire hangers. While the hangers tugged and scratched [Briggs'] skin, [McWaters] tried to "stomp [her] face in the ground." As [Briggs] struggled to get up, [McWaters] grabbed her by the neck, pulled her to the ground, and strangled her[. Briggs] testified that she could not breathe for "about three, four seconds."

Once [Briggs] was able to stand again, [McWaters] grabbed her by her neck, picked her up, and "choked[-]slammed her to the ground" where she landed hard on her back. [Briggs] could not breathe for "about five seconds this [second] time." [Briggs] smacked [McWaters] across the face and Adechokan called [Briggs] "disrespectful" for slapping [McWaters] and threatened

to "knock [Briggs] the F out." [Briggs] then lashed out and attempted to hit Adechokan, but was yanked back by [McWaters]. The baby was on the bed during this altercation until Brooks finally came and removed her from the room.

Malcolm told Adechokan to leave the house and advised [Briggs] to "stop putting [her] hands on [McWaters because] he's a man. At some point in time[,] he's going to get angry." [McWaters] followed Adechokan outside the house, and [Briggs] followed [McWaters]. As they were arguing outside, [McWaters] continued to antagonize [Briggs] by pulling and dragging her around. To resist [McWaters], [Briggs] held onto a pillar supporting the roof on the porch, and [McWaters] "tr[ied] to yank [her] off..." [Briggs] told [McWaters] to "stop pulling [her before he] break[s] [her] arm," and [McWaters] ignored her. [Briggs] pleaded with [McWaters] to "go and check on the baby" to no avail. When [McWaters] finally let her go, [Briggs] went inside alone to retrieve their baby from Brooks and gather her belongings.

[Briggs] returned inside, and Malcolm handed her a phone to talk to [McWaters'] grandmother, Sherye Robbins []. Robbins asked [Briggs] what was going on at the house, and [Briggs] responded that [McWaters] was cheating on her, she's "never coming back here," and she would not be leaving their baby at [McWaters'] house any longer. Robbins testified she could hear in the background "hollering, screaming, that 'I'm going to get you.'"

After returning the phone to Malcolm, who went back outside, [Briggs] saw [McWaters] leaning on the passenger's side window of Adechokan's car. [Briggs] approached to ask why [McWaters] was "so worried about [Adechokan]" when his daughter was inside and had just been nearly injured by his attack. Seeing [Briggs] walk towards the car, Adechokan suddenly tried to "pull off and almost hit [Briggs] with her car." [McWaters] then "ran around the car and grabbed [Briggs] from behind," hooking his elbow around her neck. [McWaters] strangled her a third time for "ten to fifteen" seconds, making this attack "one of the longest times he was choking [her]." When [McWaters] let [Briggs] go, she "had to really catch her breath." Adechokan got out of her car and continued to accost and attempt to assault her, forcing [Briggs] to "move so [Adechokan] wouldn't hit [her]," and eventually she got back in her car and sped off.

[McWaters] then grabbed [Briggs] by the head and shoved her backwards. [Briggs] pushed [McWaters] back and "he got upset." [McWaters] grabbed [Briggs] by the neck for the fourth time and slammed her into a metal box on a utility pole. [McWaters] strangled [Briggs] for "maybe seven, eight seconds" against the pole before finally letting her go. [McWaters] and Malcolm went back inside the house, leaving [Briggs] alone to stumble back inside, dizzy from the impact and feeling as though she "was going to pas[s] out."

After catching her breath, [Briggs] again tried to collect her and the baby's belongings from [McWaters'] room, but [McWaters] was constantly "getting in her way." [Briggs] tried to use her elbow to keep him away, but [McWaters] pushed her around his room, shoving her into the desk in the [corner]. When [Briggs] got up, [McWaters] pushed her again and slammed her down onto his bed, strangling her for the fifth and final time with one hand while raising the other as if to punch her. [Briggs] could not determine how long [McWaters] strangled her, but she could not breathe the entire time [McWaters] had his hand wrapped around her neck. Cumulatively, [McWaters] strangled [Briggs] and obstructed her breathing for over twenty-five seconds. After this final attack, [Briggs] was able to finish packing up her belongings, get the baby from Brooks, and leave the [McWaters] house. Brooks helped [Briggs] carry her belongings outside and loaded her car. Before [Briggs] left to go to her mother's, Brooks apologized to her, expressing sorrow she "had to go through this."

Once at her mother's house, [Briggs] told her what [McWaters] had done. [Briggs'] mother called the police twice that day, being told both times that "somebody was coming out[, but] they never did." The next morning, [Briggs] went to the hospital, where the police were called again and finally came to take a report.

[Briggs'] injuries included bruises, abrasions, and scratches. [Briggs] told doctors she felt "dizzy, nauseous, and [she] had a really[,] really bad headache." Additionally, she "really couldn't move" because her body was so sore from the beatings. Doctors diagnosed [Briggs] with a concussion and told her she was "badly bruised internally." [Briggs] suffered dizziness, nausea, and headaches for "maybe a week and a half [to] two weeks…" after the attacks. [Briggs] was also put on a "dead man's profile" at her army job, meaning she could not do any "vigorous work" and [was] barred from completing her physical training. [Briggs] took

photographs of her injuries within a week of the assault which the Commonwealth entered into evidence without objection. The Commonwealth also entered [Briggs'] medical records, showing her concussion diagnosis and the extent of her other injuries, without objection.

Trial Court Opinion, 9/1/20, at 1-6 (internal citations omitted).

The matter proceeded to a bench trial on November 1, 2019, after which the trial court found McWaters guilty of strangulation, simple assault, and REAP. On February 21, 2020, the court sentenced McWaters to eighteen to thirty-six months' incarceration and imposed a stay-away order against him with regard to Briggs. McWaters filed a timely notice of appeal and Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. McWaters raises the following issues for our review:

1. Was the evidence insufficient to sustain the guilty verdicts for strangulation, simple assault[,] and REAP, as [Briggs] was the aggressor throughout the altercation, did not have permission to be in the home at the time when she attacked [McWaters] and [Adechoken], and [McWaters] was attempting to restrain [Briggs] from attacking him and [Adechoken], using reasonable and lawful force to defend himself and [Adechoken] while in his own home?

2. Were the guilty verdicts for strangulation, simple assault and REAP against the weight of the evidence as the evidence at trial was that [Briggs] was the aggressor who attacked [McWaters] and [Adechoken] while [McWaters] was using reasonable and justified force to restrain [Briggs] from physically attacking [McWaters] and [Adechoken]?

Brief of Appellant, at 7 (reordered for ease of disposition).

With regard to McWaters' sufficiency of the evidence claim, we note our standard of review: we must determine whether the trier of fact could have

- 5 -

established every element of each crime with which the defendant was charged beyond a reasonable doubt. *Commonwealth v. Swann*, 635 A.2d 1103, 1104 (Pa. Super. 1994). In doing so, we view the evidence in the light most favorable to the verdict winner, giving the Commonwealth the benefit of all reasonable inferences to be drawn therefrom; we will not re-weigh the evidence and substitute our judgment for that of the fact-finder. *Rivera*, *supra* at 495; *Commonwealth v. Melvin*, 103 A.3d 1, 39-40 (Pa. Super. 2014). Further, the Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt through wholly circumstantial evidence. *Commonwealth v*. *Glass*, 200 A.3d 477, 490 (Pa. Super. 2018), citing *Melvin*, *supra* at 39-40. The Commonwealth need not, however, preclude every possibility of the defendant's innocence. *Id.* The factfinder may resolve any doubts surrounding a defendant's guilt unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact may be drawn from the combined circumstances. *Id.* In doing so, the factfinder must evaluate the entire record and consider all evidence received, and remains free to believe all, part, or none of the evidence. *Id.*

McWaters argues that the evidence was insufficient to sustain his strangulation, simple assault, and REAP convictions because Briggs was the initial aggressor throughout the altercation and had no permission to be in the residence. *See* Brief of Appellant, at 20. McWaters further contends that Briggs was the one who attacked him, and that he was merely using

- 6 -

"reasonable and lawful force" in defending Adechokan and himself in attempting to restrain Briggs. ***Id.***

A person commits strangulation when he knowingly or intentionally impedes another person's breathing or circulation by applying pressure to that person's throat or neck. 18 Pa.C.S.A. § 2718(a)(1). A person commits simple assault if he "attempts to cause or intentionally, knowingly[,] or recklessly causes bodily injury to another." 18 Pa.C.S.A. § 2701(a)(1). Bodily injury is an "impairment of physical condition or pain." 18 Pa.C.S.A. § 2301. Finally, a person commits REAP, a second-degree misdemeanor, by recklessly engaging in conduct that places or may place another person in danger of death or serious bodily injury. 18 Pa.C.S.A. § 2705. Serious bodily injury constitutes that which creates a substantial risk of death, serious and permanent disfigurement, or the protracted loss or impairment of any bodily member or organ's function. ***Id.*** REAP is a crime directed against reckless conduct that poses a serious risk "to life or limb [that is] out of proportion to any utility the conduct may have." ***Commonwealth v. Vogelsong***, 90 A.3d 717, 719 (Pa. Super. 2014). REAP is a crime of assault, the *mens rea* for which requires a conscious disregard of a known risk of death or great bodily harm. ***Commonwealth v. Hopkins***, 747 A.2d 910, 916 (Pa. Super. 2000); ***Commonwealth v. Trowbridge***, 395 A.2d 1337, 1339 (Pa. Super. 1978).

Viewing the evidence in the light most favorable to the Commonwealth as verdict-winner, the record establishes that McWaters punched Briggs in the

face, choked Briggs for three or four seconds, shoved Briggs, and attempted to stomp her face into the ground. N.T. Waiver Trial, 11/1/19, at 18-24. While Briggs fought with Adechokan, and again as Briggs attempted to leave, McWaters choked Briggs for ten to fifteen seconds, during which Briggs was unable to breathe. *Id.* at 25, 32. Outside, McWaters pushed Briggs' head with his hands. *Id.* at 33-35. As Briggs attempted to fight back, McWaters pushed Briggs against a utility pole and choked her for seven or eight seconds. *Id.* After Briggs went back into the house to retrieve her baby and belongings, they began fighting again. *Id.* at 37-38. McWaters shoved Briggs into a desk and swung and slammed her onto the bed, where he choked and punched her. *Id.* The next morning, Briggs went to the hospital where she was diagnosed with a concussion, abrasions, and internal bleeding. *Id.* at 42-43. Briggs' symptoms lasted one to two weeks, and she was given physical accommodations at work as a result of her injuries. *Id.* 43-44.

The evidence of record demonstrates that McWaters knowingly or intentionally impeded Briggs' ability to breathe numerous times by choking her for extended periods of time. The evidence is therefore sufficient to support his strangulation verdict. *See* 18 Pa.C.S.A. § 2718(a)(1). We agree with the trial court that McWaters' repeated instigation of the brutal violence, paired with the extent of the injuries he caused Briggs, establish sufficient evidence of his intent to cause bodily harm via strangulation. *See* Trial Court Opinion 9/1/20, at 8; *see also Glass*, *supra*. Accordingly, we reject

- 8 -

McWaters' argument that Briggs was the initial aggressor, and we conclude the evidence is sufficient to support McWaters' guilt with respect to strangulation and simple assault. **See Swann**, **supra**.

With respect to McWaters' REAP conviction, his repeated strangulation and closed-fist striking of Briggs demonstrate his intent to cause Briggs serious bodily injury, satisfying the *mens rea* requirement of recklessness necessary for conviction under 18 Pa.C.S.A. § 2705. **See Hopkins**, **supra** 747 A.2d at 916. Accordingly, the evidence is sufficient to uphold McWaters' REAP conviction as well. **See Swann**, **supra**.

Turning to McWaters' weight of the evidence claim, it is well-settled that such claims must first be raised with the trial judge. Pa.R.Crim.P. 607. Appellants must preserve weight claims in a post-sentence motion, by a written motion before sentencing, or orally prior to sentencing. **Id.**; **Commonwealth v. Priest**, 18 A.3d 1235, 1239 (Pa. Super. 2011). Failure to properly preserve the claim will result in its waiver, *even if the trial court addresses the issue in its opinion*. **Commonwealth v. Rivera**, 238 A.3d 482, 497 (Pa. Super. 2020) (emphasis added), citing **Commonwealth v. Sherwood**, 982 A.2d 483, 494 (Pa. 2009).

Here, McWaters never filed a post-sentence motion or challenged the weight of the evidence before the trial court, either orally or in writing. Accordingly, by failing to preserve his weight claim under Rule 607, McWaters has waived it. We therefore reject McWaters' request that this Court consider

this issue "in the interest of justice and judicial economy."[4]  ***See Rivera***,

***supra***.  This claim has been waived, and thus we will not consider it.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/27/2021

---

[4] McWaters argues that although trial counsel did not file post-sentence motions attacking the weight of evidence claim, McWaters raised the issue in his Rule 1925(b) statement, the trial court thoroughly considered it in its opinion and district attorney's brief, and that this Court should therefore consider this issue "in the interest of justice and judicial economy."  Reply Brief of Appellant, at 5.