J-S17002-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.J., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.J., GUARDIAN | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 356 EDA 2022 |

Appeal from the Order Entered January 10, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002086-2015

BEFORE: BOWES, J., LAZARUS, J., and STABILE, J.

MEMORANDUM BY BOWES, J.:                    **FILED JULY 15, 2022**

A.J. ("Foster Father") appeals from the January 10, 2022 order in which the trial court found by clear and convincing evidence that Foster Father was a perpetrator of child abuse against J.J., born in April 2014. We affirm.

Foster Father is J.J.'s maternal great-grandfather. He and his paramour, L.S., served as the foster parents for J.J. and her older sister, M.W., for several years.[1] In June 2019, when J.J. was four years old, L.S. took J.J. to the doctor after approximately two weeks of abnormal vaginal discharge. On June 24, 2019, J.J. tested positive for gonorrhea in her throat, vagina, and anus. Given J.J.'s age and the fact that gonorrhea can only be transmitted sexually, a child protective services report was sent to the Department of Human Services ("DHS"). J.J. was removed from the care of Foster Father and L.S. Following

---

[1] While in the pre-adoptive home of Foster Father and L.S., the parental rights of the girls' biological parents were terminated.

an investigation, DHS concluded that the report of child sexual abuse was indicated as to Foster Father and L.S. Specifically, Foster Father was indicated based upon committing the sexual abuse and L.S. was indicated for failure to immediately seek medical treatment.

On December 18, 2019, DHS filed a motion alleging that J.J. was the victim of child abuse pursuant to the Child Protective Services Law, 23 Pa.C.S. § 6303, naming Foster Father and L.S. as perpetrators of the abuse. DHS subsequently sought to introduce J.J.'s out-of-court statements pursuant to the Tender Years Statute, 42 Pa.C.S. § 5985.1.

The trial court held a hearing on the Tender Years Statute motion on January 25, 2021. DHS presented the testimony of Rebecca Rossi, the case manager from the community umbrella agency ("CUA") assigned to J.J., and C.B., J.J.'s current foster mother. The court also interviewed J.J. Following the hearing, the court found J.J. unavailable due to her inability to discuss the abuse in a courtroom setting and granted DHS permission to admit her out-of-court statements in its case-in-chief on the child abuse motion.

The trial court held hearings on the child abuse motion on September 23, 2020, January 25, 2021, March 30, 2021, June 22, 2021, and January 10, 2022. DHS presented the testimony of Dr. Colleen Bennett, an expert in pediatric child abuse; Colleen Getz, a forensic interviewer at Philadelphia Children's Alliance ("PCA"); Emily Lipscomb, DHS investigator; Madelina Hoch, J.J.'s therapist; T.B., J.J.'s current babysitter; and C.B. Foster Father testified on his own behalf and called N.B., a family friend, as a witness. L.S. testified

on her own behalf and called N.B. as a witness, and the parties stipulated to the testimony of L.S.'s adult sons. DHS recalled Ms. Lipscomb in rebuttal. At the conclusion of the hearings, the trial court found that DHS had not met its burden as to L.S., but found by clear and convincing evidence that J.J. was a victim of child abuse under § 6303(b.1)(4) and (6), and that Foster Father was the perpetrator of that abuse.

This timely appeal followed. Both Foster Father and the trial court have complied with Pa.R.A.P. 1925.[2] Foster Father presents the following issues for our review:

1. Did the lower court err in finding that there was clear and convincing evidence that the appellant committed child abuse against the child?

2. Did the lower court err by considering hearsay evidence and other inadmissible evidence?

3. Did the lower court err in finding that the child was unavailable to testify?

4. Did the lower court err by not properly considering evidence that tended to show that there were viable alternatives outside of the appellant as to who abused the child and how it occurred such that there was a lack of sufficient evidence to determine that the appellant committed the abuse?

Foster Father's brief at 4. Although phrased as four issues, Foster Father essentially challenges the trial court's finding that J.J. was unavailable under

---

[2] J.J. was represented by Jeffrey Bruch, Esquire, as guardian *ad litem* during the hearings. Attorney Bruch filed a letter joining the brief of DHS on appeal.

the Tender Years Statute and that DHS established by clear and convincing evidence that Foster Father was a perpetrator of child abuse.[3]

We review a trial court's decision to admit evidence pursuant to the Tender Years Statute for an abuse of discretion. *See Commonwealth v. Curley*, 910 A.2d 692, 697 (Pa.Super. 2006) (citation omitted). By way of background, "the Tender Years Statute creates an exception to the hearsay rule in recognition of the fragile nature of the victims of childhood sexual abuse." *Commonwealth v. G.D.M., Sr.*, 926 A.2d 984, 988 (Pa.Super. 2007) (citation omitted). Specifically, the statute provides as follows:

**(a) General rule.--**

(1) An out-of-court statement made by a child victim or witness, who at the time the statement was made was 16 years of age or younger, describing any of the offenses enumerated in paragraph (2), not otherwise admissible by statute or rule of evidence, is admissible in evidence in any criminal or civil proceeding if:

(i) the court finds, in an *in camera* hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

(ii) the child either:

---

[3] Additionally, Foster Father asserts in the argument section of his brief that several of the trial court's rulings on objections made at the hearings were erroneous. *See* Foster Father's brief at 10, 12. Insofar as Foster Father is attempting to seek review of those alleged errors in this Court, they are waived for failing to develop them in any meaningful manner. *See Commonwealth v. Sherwood*, 982 A.2d 483, 496 (Pa. 2009) ("By failing to provide any discussion of the claim with citation to relevant authority, Appellant has waived review of this claim.").

(A) testifies at the proceeding; or

(B) is unavailable as a witness.

. . . .

**(a.1) Emotional distress.--**In order to make a finding under subsection (a)(1)(ii)(B) that the child is unavailable as a witness, the court must determine, based on evidence presented to it, that testimony by the child as a witness will result in the child suffering serious emotional distress that would substantially impair the child's ability to reasonably communicate. In making this determination, the court may do all of the following:

(1) Observe and question the child, either inside or outside the courtroom.

(2) Hear testimony of a parent or custodian or any other person, such as a person who has dealt with the child in a medical or therapeutic setting.

42 Pa.C.S. § 5985.1.

Instantly, Foster Father's challenge to J.J.'s unavailability is premised on an allegation that there is no evidence that she would have suffered serious emotional distress or that she would have been unable to communicate.[4] Foster Father's brief at 41-42, 46. Additionally, he contends the court did not conduct a complete interview of J.J. and that she ended the interview by stating she used to live with Foster Father and she liked it there. *Id*. at 45.

As noted, DHS presented the testimony of Ms. Rossi, the CUA case manager, and C.B., J.J's current foster mother during the Tender Years

---

[4] Foster Father incorrectly cites § 5986 instead of § 5985.1. Section 5986 concerns the admission of hearsay statements by children in dependency proceedings.

Statute hearing. They both testified that, based on their interactions with J.J., she would not be able to communicate what happened at Foster Father's home in a courtroom setting. N.T., 1/25/21, at 15-16, 37-38.

Foster Father incorrectly asserts that Ms. Rossi only discussed abuse with J.J. before her removal from Foster Father's home in June 2019 and therefore there was no evidence "that anything had yet happened to the child." Foster Father's brief at 43. The record bears out, however, that as of January 25, 2021, Ms. Rossi was the current CUA case manager for J.J., she had been her case manager for approximately one-and-a-half years after being assigned in the summer of 2019, and she "wasn't the worker when [J.J.] was in the previous home" of Foster Father and L.S. N.T., 1/25/21, at 10-12, 18-19. Ms. Rossi testified that when she asked J.J. about what happened in Foster Father's home or generally about inappropriate touching, J.J. would shut down and change the subject, making it clear that she was not comfortable talking about what happened. *Id*. at 12-15.

With regard to C.B.'s testimony, Foster Father asserts that C.B. did not testify to any observations of emotional distress and "admitted that the child had opened up to strangers about sex abuse" because J.J. had told C.B., her babysitter, and her therapist about the abuse. Foster Father's brief at 44-45. However, C.B. specifically testified that J.J. told her that only C.B. and her babysitter were allowed to know J.J.'s "secret" about what happened. N.T., 1/25/21, at 49. After the forensic interview at PCA, C.B. testified that J.J. was

upset, wanted to go home, and stated that she was not going to tell anyone her secret. *Id*. at 55-56.

Most importantly, the court conducted an *in camera* interview of J.J., who was five years old at the time. Upon review, we find Foster Father's characterization of how the interview ended, like his characterization of the testimony of Ms. Rossi and C.B., to be belied by the record. During most of the interview, J.J. was able to converse with the court and offer unprompted comments about her babysitter and the color of a room. However, when the court pressed J.J. on the topic of her former foster home at the end of the interview, her responses significantly dwindled, and her demeanor changed, as evidenced by the following exchange:

The Court: Are you able to tell me who was in your old house?

[J.J.]: My grandpa and my grandma.

The Court: Anybody else there?

[J.J.]: Just me and my sister and them.

The Court: Oh, okay. Did you like living there?

[J.J.]: Mm-hm.

The Court: Are you okay?

[J.J.]: Uh-huh.

The Court: Did you like living in your old house?

[J.J.]: No (unintelligible).

The Court: Do you know why you didn't like it?

[J.J.]:     Uh-huh.

N.T., 1/25/21, at 69-70.

At that point, the court concluded the interview and subsequently declared J.J. unavailable as follows:

It is my job to determine how much emotional distress a child would suffer, and clearly, in just a few questions that I asked, [J.J.'s] demeanor changed dramatically. At one point, she froze.

And so, I'm not going to – this is Family Court and I am not going to subject a child to cross-examination, quite frankly, when, with just me questioning her, she froze and, clearly, her eyes got extremely wide.

She looked as if she was about to burst into tears at any moment, and that's without even pressing her on what potentially happened to her. That, to me, is the biggest evidence that I would need to determine that she's unavailable, in conjunction with what the CUA worker testified to . . . that, whenever asked, she shuts down, she changes the subject.

She clearly didn't shut down completely and change the subject, but she became visibly uncomfortable when I started asking questions about her former foster homes, which would've been with [Foster Father and L.S.]

*Id*. at 71-72.

The certified record supports the trial court's findings. Clearly, the trial court based its determination not solely on testimony by Ms. Rossi and C.B., but most significantly on its observations of J.J. when it attempted to ask her about living with Foster Father and L.S. Thus, the trial court did not abuse its discretion in finding J.J. unavailable for purposes of the Tender Years Statute.

Next, we consider Foster Father's challenge to the court's finding that he was a perpetrator of child abuse against J.J., mindful of the following:

- 8 -

> The standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

***Interest of S.L.***, 202 A.3d 723, 727 (Pa.Super. 2019) (quoting ***In re R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010)). The trial court determined that Foster Father perpetrated child abuse pursuant to § 6303(b.1)(4) and (6), which provide as follows:

> **(b.1) Child abuse.--**The term **"child abuse"** shall mean intentionally, knowingly or recklessly doing any of the following:
>
> . . . .
>
> (4) Causing sexual abuse or exploitation of a child through any act or failure to act.
>
> . . . .
>
> (6) Creating a likelihood of sexual abuse or exploitation of a child through any recent act or failure to act.

23 Pa.C.S. § 6303(b.1). The terms "intentionally, knowingly or recklessly" have the same meaning as set forth in 18 Pa.C.S. § 302. ***See*** 23 Pa.C.S. § 6303(a). Section 302 provides as follows in relevant part:

> (1) A person acts intentionally with respect to a material element of an offense when:
>
> (i) If the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and
>
> (ii) If the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.

(2) A person acts knowingly with respect to a material element of an offense when:

(i) If the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

(ii) If the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

(3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b).

A finding of child abuse pursuant to § 6303(b.1) must be supported by clear and convincing evidence. *In re L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015). Clear and convincing evidence is "evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *G.V. v. Dep't of Pub. Welfare*, 91 A.3d 667, 672 (Pa. 2014).

Foster Father argues that there was no evidence that he had venereal disease at the time J.J. was infected and that because he tested negative for gonorrhea around June 25, 2019, he should have been "ruled out as the perpetrator." Foster Father's brief at 35-36. Moreover, he contends that DHS failed to investigate other viable suspects. *Id*. at 38-41. In this regard, he relies on the testimony of L.S. that J.J. was missing in the basement for about

an hour with an unknown contractor while she was in a nightgown, and that she was unsupervised in the bathroom at daycare, at a baby shower, and while staying overnight with a relative. *Id*. at 39-41, 49-50. He also emphasizes J.J.'s identification of the "boy who looked like pop-pop" during the forensic interview as evidence that the abuser was one of the unknown contractors and not Foster Father. *Id*. at 38-39. Finally, he challenges the credibility of J.J.'s out-of-court statements that implicated Foster Father and assails C.B.'s testimony during DHS's case-in-chief because it was more detailed than that given at the Tender Years Statute hearing. *Id*. at 48-49.[5]

The court entered its findings on the record after the hearings concluded as follows:

> The testimony is that [Foster Father] did test positive for gonorrhea, albeit in December of 2018; that he was not forthcoming. In fact, he would not sign the releases of information or even go and get tested when DHS asked him to get tested and that DHS only learned of the fact that he tested positive based on

---

[5] Foster Father would have this Court disregard J.J.'s out-of-court statements outright based on his argument that they were improperly admitted. ***See*** Foster Father's brief at 34-35, 47-48. This claim fails for two reasons. First, Foster Father's contention that DHS failed to prove its case by clear and convincing evidence essentially challenges the sufficiency of the evidence, which we cannot review on a diminished record. ***See e.g., D'Alessandro v. Pennsylvania State Police***, 937 A.2d 404, 410 (Pa. 2007) (plurality) (quoting ***Commonwealth v. Lovette***, 450 A.2d 975, 977 (Pa. 1982)) ("A sufficiency claim will not be reviewed on a diminished record, 'but rather on the evidence actually presented to the finder of fact rendering the questioned verdict.'"). Moreover, as discussed *supra*, the court did not err in admitting the out-of-court statements under the Tender Years Statute. Therefore, even if it were acceptable for this Court to review Foster Father's claim on a diminished record, the challenged statements were properly admitted.

- 11 -

the records that they received from the Department of Health for Philadelphia.

And then subsequent to that, he was confronted. And after [J.J.] had tested positive, a couple days after and a couple days after DHS asked him to take the test, unlike [L.S.] and his father, who took test right away, then he went and took the test and was able to produce a negative test.

. . . .

Based on all of the testimony provided as well as the doctor's testimony, it is clear [J.J.] did not contract gonorrhea on her own. She's only four. Some adult had to give it to her and it had to be through sexual contact. And it is unconscionable to think that the sexual contact was both in her throat, in her vagina and in her rectum.

That being said, through the testimony, it is not entirely inconceivable for a child as young as [J.J.] – she was only four when this happened – to not be able to identify the family member that is suppose[d] to provide love and care directly and instead say the monster who looked like pop-pop or the man who looked like pop-pop.

It is not entirely inconceivable that for a child of [J.J.'s] age she would reference a penis as a hammer. From her perspective that would be what she could relate to. She [has] seen a hammer. She knows what a hammer is. As a four year old, that's conceivable. But to actually know, as a four year old, what a penis is and to be able to identify it, no one would expect a four year old to be able to do that.

And so, this Court is going to find [Foster Father] as a perpetrator of sexual abuse based on all of the testimony because I do believe [DHS] has met its burden by clear and convincing evidence as to [Foster Father].

N.T., 1/10/22, at 142-44.

Once again, the certified record supports the trial court's findings and contradicts the assertions of Foster Father. Ms. Lipscomb, the DHS

investigator, testified that J.J. told her that "her daddy, who she also referred to as pop-pop, had touched her butt with a hammer and when saying that, she pointed to her genital area, when talking about her butt." N.T., 3/30/21, at 20. Additionally, the certified record supports the trial court's conclusion that Foster Father was evasive about his gonorrhea status. Critically, he had tested positive for gonorrhea in December 2018, but did not volunteer that information to Ms. Lipscomb during her investigation.

After J.J. tested positive for gonorrhea on June 24, 2019, Ms. Lipscomb directed Foster Father, L.S., and Foster Father's father (who lived in the same household) to be tested for sexually-transmitted infections and to sign releases for the Veterans Administration ("VA"), where the testing was to take place, and for the Department of Public Health. L.S. and Foster Father's father submitted to testing the same day and signed the requested releases, ultimately producing certified negative results. *Id*. at 24-26. Foster Father did not submit to testing that day and refused to sign releases for medical records from the VA. He did sign the Department of Public Health release and subsequently attempted to introduce uncertified records of a negative test from the VA dated June 27, 2019. *Id*. at 30, 62-63. Ms. Lipscomb did not credit this test result in her investigation because, even if verified, it did not reflect Foster Father's gonorrhea status at the time J.J. was infected. *Id*. at 67. When Ms. Lipscomb later discovered that Foster Father had tested positive for gonorrhea in December 2018, via the Department of Public Health release,

she confronted Foster Father and L.S. with the information. Foster Father's response was that the test result was a lie, he never tested positive, and that DHS was trying to pin it on him. *Id*. at 32.

Contrary to L.S.'s trial testimony, L.S. told Ms. Lipscomb during her investigation that the sole instance of J.J. being unsupervised with the contractors in the basement lasted for several minutes and that J.J. did not appear disheveled afterwards or exhibit any change in behavior. *Id*. at 21; 101, 104-05, 111-12. After interviewing the head contractor, L.S.'s nephew, Ms. Lipscomb found the account that J.J. was sexually abused by one of the contractors to not be credible. *Id*. at 28. Ms. Lipscomb also investigated the daycare J.J. attended and ruled that out as a location where J.J was abused. *Id*. at 89-93; N.T., 1/10/22, at 101-05. Finally, neither L.S. nor Foster Father disclosed during DHS's investigation that J.J. was unsupervised at a baby shower or at an overnight visit with a relative during the relevant timeframe. N.T., 1/10/22, at 105-06.

J.J.'s current babysitter, T.B., testified that J.J. only ever referred to Foster Father as pop-pop and that, one day, J.J. told T.B. that pop-pop touched her "pussy," that she did not want to go back to her former foster home, and that pop-pop was a monster. N.T., 3/30/21, at 143-44, 155. On more than one occasion, J.J. told C.B. that Foster Father, who she referred to as pop-pop, used to lick her "pussy," "butt," or "coo-coo," while pointing to

her vagina. *Id*. at 158-160.[6] Additionally, Ms. Hoch testified that during a therapy session, J.J. referred to the monster and pop-pop, saying that he "licked my vagina[.]" *Id*. at 116.

During the forensic interview, J.J. told Ms. Getz that "the boy who looked like pop-pop put his hands – played patty-cake with her butt and pointed to her vaginal area, and said that the boy touched her butt – again pointing to her vaginal area – with a hammer. She said that it hurt, and her butt was bleeding." N.T., 1/25/21, at 79. After the interview, Detective Christopher Casey spoke with J.J., who stated that pop-pop touched her butt and identified a picture of Foster Father. *Id*. at 80-81. Additionally, J.J. stated that the boy punched her mouth with his hands because she said the f-word, that pop-pop told her not to say the f-word, and that pop-pop beat her with a belt. *Id*. at 88.

Ms. Getz observed that it is not uncommon for children J.J.'s age to not be able to identify their perpetrator outright or use appropriate body part names. *Id*. at 80. Contrary to Foster Father's argument that the reference to a boy exculpates him because he is an adult, Ms. Getz testified that "children who are four years old will often use boy and girl to refer to anyone

---

[6] Although C.B. provided more detail about J.J.'s disclosures during DHS's case-in-chief, we do not conclude that this discredits her testimony. The focus of her testimony during the Tender Years Statute hearing was not the content of J.J.'s disclosures, but her demeanor around those disclosures and her ability to testify in a courtroom about the abuse without serious emotional distress.

who could potentially fit in that box, in their understanding. It's very unlikely, or uncommon, for a child to speak about the boy versus the man, as an adult would." *Id*. at 99.

Dr. Bennett testified that gonorrhea "requires sexual transmission," does not transmit merely through surface contact, and that this was not a potential instance of neonatal gonorrhea. N.T., 9/23/20, at 57, 74. Rather, gonorrhea in a child J.J.'s age in the vaginal area is diagnostic of sexual abuse. *Id*. at 63-64. Upon review of the certified record, the trial court did not err in concluding that DHS established by clear and convincing evidence that J.J. was the victim of sexual abuse and that Foster Father was the perpetrator of that abuse.

Based on the foregoing, we affirm the January 10, 2022 order finding Foster Father to be a perpetrator of child abuse pursuant to § 6303(b.1)(4) and (6).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/15/2022