J-A21023-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                                :           PENNSYLVANIA
                                :
           v.                 :
                                :
                                :
JASON MICHAEL AMOSS          :
                                :
          Appellant         :    No. 1343 MDA 2024

Appeal from the Judgment of Sentence Entered August 19, 2024
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0005339-2022

BEFORE:   PANELLA, P.J.E., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LANE, J.:           **FILED SEPTEMBER 16, 2025**

Jason Michael Amoss ("Amoss") appeals from the judgment of sentence imposed following his convictions for indecent assault and corruption of minors.[1] We affirm.

We glean the following factual history from the testimony and evidence presented at trial. Between 2003 and 2008, Amoss was living with his wife, stepdaughter ("C.A."), who he formally adopted in 2005, and son in their family home in Delta, Pennsylvania. During this period, and while C.A. was between the ages of six and ten, Amoss sexually abused her on multiple occasions while they were alone together in their home and while on vacation. Within the home, this abuse typically occurred in the bathroom and Amoss' bedroom. C.A. recalled that one of the first instances of abuse occurred when

---

[*] Former Justice specially assigned to the Superior Court.

[1] **See** 18 Pa.C.S.A. §§ 3126(a)(7), 6301(a)(1).

she entered her bathroom to shower just after Amoss had exited, and that just before she started to undress, she noticed that he had left his phone on the floor in the corner of the room to record her. When she subsequently attempted to return the phone to Amoss, she discovered that Amoss was standing just outside her bathroom door. Following this event, and on multiple occasions while C.A. was between the ages of seven and eight, Amoss would bring her to his bathroom to shower together. During these showers, both Amoss and C.A. "would have all of [their] clothes off . . . and [Amoss' penis] would always be erect." N.T., 3/13/24, at 113. These interactions ultimately caused C.A. to feel "[s]cared and confused" as it "didn't seem like something that should have been happening." *Id*. at 115.

These types of sexual interactions escalated further while in Amoss' bedroom. Most commonly, Amoss would initiate these sexual events by calling C.A. into his bedroom and telling her that she "needed to help him[.]" *Id*. at 116. When C.A. arrived in his room, he would instruct her to "go sit on the bed[,]" which he had prepared by placing "towels down on" it. *Id*. Amoss "would [then] go into the bathroom and come out in just his boxer[ shorts while holding] lotion and . . . have [her] masturbate him." *Id*. Although C.A. would remain clothed during some of these interactions, there were numerous occasions where she would have "just [her] shirt off[, or] just underwear o[n, or have] everything off." *Id*. This type of interaction occurred "[p]retty often" when C.A. was alone with Amoss, to the extent that it "was kind of routine." *Id*. at 117.

Amoss would also bring C.A. into his bedroom to give her his version of "the sex talk[,]" during which he would have C.A. lie on his bed, "take off [her] pants and [her] underwear[,]" and teach her "how to masturbate." *Id*. at 120. In doing so, Amoss would begin by verbally instructing C.A. to "press on [her clitoris] and move up." *Id*. However, if C.A. indicated that she "didn't understand what he meant by that, [Amoss would then] touch[ her genitals with his hands] and show[ her] what to do." *Id*. During one such session "when he was explaining [C.A.'s] anatomy to" her, Amoss took photos of C.A.'s genital area with his cell phone so that "he could show [her] what it looked like." *Id*. at 124. These "sex talks" often resulted in C.A. masturbating Amoss while he touched her legs, genitals, and chest. C.A.'s physical involvement in these "sex talks" peaked at the age of ten, when Amoss had her "climb on top of him[,]" while he was lying down on his back and they were both naked, so that she would be "straddling him" with "his penis . . . pressed flat against [her] crotch [and] vulva[.]" *Id*. at 120-22.

The sexual abuse also occurred "very often" outside of the family home, when Amoss and C.A. would take trips to Florida with "just the two of" them, whereupon they "would go on a lot of Disney cruises . . . stay in hotels[,] go to . . . Disney World, . . . Universal and other sorts of stuff." *Id*. at 125. While on these trips, Amoss would book hotel rooms with only one bed so that he and C.A. would have to share. Amoss would then "give [C.A.] the sex talk[,]" touch her with his hands, and have her "masturbate him[.]" *Id*. at 126. On one of these occasions, Amoss had C.A. complete a survey with the promise

that she "would get a significant amount of money" if she finished it. *Id*. at 130. As she "filled out the survey[,]" however, C.A. soon discovered that "it was all about sex in relation to" herself, as it asked her questions such as whether she had "ever masturbated before[,]" how often she did so if she had, and whether she had "ever gotten wet before[.]" *Id*. This type of behavior led to C.A. "put[ting] a barrier of pillows in between" herself and Amoss in their shared bed at night, as she "was scared something was going to happen to [her] while [she] was sleeping." *Id*. at 127-28. Even so, C.A. recalled that during one of these nights when she was attempting to sleep, Amoss began speaking to her about sex to the extent that it "made [her] uncomfortable enough to turn the light on." *Id*. at 128.

These types of encounters continued while the two would go on cruises, with Amoss again forcing C.A. to "masturbate him" multiple times when they were alone in their cabin. *Id*. at 131. During one of these cruises in particular, Amoss initiated a sexual event by telling C.A. that they "were going to play a game" which required her to remove her shirt and pants and wear a blindfold. *Id*. Amoss would similarly remove all of his clothing except his boxer shorts. When playing the game, Amoss would "put things on his finger, like chocolate syrup, and put it in [C.A.'s] mouth, and [have her] guess what it was." *Id*. After playing this game with "a few different things" on his finger, however, Amoss eventually "put his penis into [C.A.'s] mouth[,]" which she immediately recognized as such based on its "[s]ize and . . . taste." *Id*.

Over the course of the above-described period of sexual abuse, Amoss would "tell [C.A.] not to tell [her] mom . . . because it would make her upset [and] angry." *Id*. at 134. He would additionally reason that "there was no need to mention it [because] when [her] mom was home, she could help him" instead. *Id*. Eventually, when C.A. "started going through puberty [and had her] first period[,] the frequency of the sex talks and the helping decreased" to the point where they did not continue past the age of ten, as it appeared to C.A. that Amoss did not "seem to have as much interest in abusing" her after she "started going through puberty[.]" *Id*. at 123-24, 133.

Years later, when C.A. was in her "later teen years[,]" she reminded Amoss of these events during a conversation regarding whether he had ever lied to her previously. *Id*. at 134. Specifically, C.A. told Amoss that he had lied to her when he had "told [her] several times [before], [']oh, this will be the last time that you'll have to help me[' masturbate, even though] it would happen again." *Id*. In response to her bringing this subject up, Amoss reminded her "in a very scary tone" that he "told [her] not to talk about that[.]" *Id*. Soon thereafter, at the age of eighteen, C.A. "realized [during a college philosophy class] that [she] had been abused when [she] was younger[,]" and thus "disclosed the whole story" to her mother when she returned home from school. *Id*. at 135. While recounting these events, C.A. "was crying" and appeared to be "scared[,] sad[,] and upset[.]" *Id*. at 200. In response to hearing about her daughter's abuse, C.A.'s mother, who had at that point legally separated from Amoss and was in the midst of a divorce,

suggested to C.A. that she immediately make a report to the police. Notably, however, C.A. refrained from doing so, as she explained that she "was scared that if [she] went to the police," her twelve-year-old brother, who Amoss and her mother still shared joint custody of, "would be sucked into this whole whirlpool." *Id*. at 136-37. C.A. subsequently dropped out of college as a result of the realization that she "was abused[.]" *Id*. at 156.

Approximately six years later, once her younger brother turned eighteen, C.A. disclosed the above history of sexual abuse to him as well. When doing so, C.A. once more appeared "very nervous, anxious[,] scared and . . . very, very sad." *Id*. at 192. C.A. then reported the abuse to Pennsylvania State Police, who scheduled her to come into the station for a sit-down interview with Trooper Timothy Reynolds ("Trooper Reynolds"). Following this interview, C.A. agreed to help Trooper Reynolds with his investigation by making a consensually recorded, non-scripted call to Amoss in an attempt to capture an admission of guilt. When C.A. broached the subject of abuse during the ensuing call, however, Amoss instead: (1) expressed a belief that he was "being set up[;]" (2) maintained that he did not know how he could respond to C.A.'s accusations of sexual abuse as he did not understand what she was talking about; and (3) issued a general apology for anything that he might have done to ever hurt her. N.T., 6/20/22, at 14, 46-47. Police subsequently arrested Amoss, and the Commonwealth charged him with aggravated indecent assault of a child, aggravated indecent assault, indecent assault, and corruption of minors.

On March 12, 2024, the date scheduled for jury selection, the Commonwealth filed a motion *in limine* to permit evidence pursuant to Pa.R.E. 404(b) as it related to C.A.'s testimony regarding the sexual acts that occurred while she and Amoss were traveling outside of the Commonwealth of Pennsylvania. The trial court addressed the motion prior to jury selection and heard arguments from both parties. Notably, Amoss' attorney responded to the motion as follows: "Clearly, it's prejudicial to my client, other unproven acts that occurred out of state or even out of the country. I'm aware there is . . . case law that supports their position. I would just argue that it's overly prejudicial and shouldn't be allowed to come in during trial." N.T., 3/12/24, at 4. The trial court ultimately granted the Commonwealth's motion.

The next day, Amoss proceeded to a jury trial, during which the Commonwealth presented testimony from C.A., C.A.'s mother, C.A.'s brother, and Trooper Reynolds, who each testified in part to the above factual history. The Commonwealth additionally presented testimony from a blind expert[2] "in the field of sexual abuse" who "render[ed] an opinion on the dynamics and response to sexual abuse and trauma." N.T., 3/13/24, at 170. Relevantly, this expert testified that victims of sexual abuse may delay the disclosure of their abuse as it requires them to "admit[] what happened to them[,]" which "is [one of] the hardest thing[s] they are ever going to do[.]" *Id*. at 175. She

---

[2] The expert testified that she had not reviewed the police report, spoken to the defendant, or knew any of the facts of the case, explaining that she "always testif[ies] blind[, s]o the only thing that [she] know[s] is what is on the subpoena." N.T., 3/13/24, at 171.

further explained that this disclosure is especially difficult for "children who have a really close relationship with their perpetrator, [such as] a close family member . . . who has been in their life their whole lives[.]" *Id*. at 176. The expert stated that in such cases, the "power and control dynamic [of a sexual abuser] is tenfold[.]" *Id*. at 177.

The expert additionally explained that the emotional responses she might see when a victim is talking about his or her sexual abuse are varied and typically appear on a spectrum. She stated that on one end of this spectrum, a victim speaking about his or her abuse may appear to have "become numb to it" to the extent that they recall details of the abuse nonchalantly and as if they were making "a peanut butter sandwich[,] because to them this abuse was an every[]day thing or a constant thing." *Id*. at 181. On the other end of the spectrum, however, the expert asserted that a victim might "not even be able to speak[, as they are not] able to control their emotions enough to get the words out." *Id*.

Nearing the end of the Commonwealth's presentation of witness testimony, Amoss' counsel motioned the court to permit testimony from Amoss' current wife, who would submit that she witnessed C.A. "giggling and laughing after she walked out of the courtroom[,] presumably after testifying" during the preliminary hearing. N.T., 3/14/24, at 215-16. Amoss' counsel argued that this testimony was relevant given that both C.A.'s mother and brother "specifically testified [about her] demeanor when she disclosed" her history of sexual abuse to them. *Id*. at 216. The trial court denied the

admission of this testimony, reasoning that "there is no evidence as to what [C.A.] was laughing about[, t]hat [it] could be any number of things[, and that a]bsent not having asked her [a question regarding her demeanor at the time of her earlier testimony] on direct, we have no way to have the jury have any context of it." *Id*. Amoss thereafter testified in his defense, relevantly asserting that although he recalled going on multiple vacations exclusively with C.A., he did not commit any of the sexual abuse that she had detailed.

At the conclusion of trial, the jury convicted Amoss of indecent assault and corruption of minors, and acquitted him of aggravated indecent assault of a child and aggravated indecent assault. On August 19, 2024, following the preparation of a post-sentence investigation report and an evaluation by the sexual offenders assessment board ("SOAB"), the trial court imposed an aggregate sentence of five to ten years' incarceration, with a consecutive three-year probationary term.[3] Amoss filed a timely notice of appeal, and both he and the trial court complied with Pa.R.A.P. 1925.

Amoss raises the following issues for our review:

(1)   Whether the honorable trial court erred in admitting evidence of alleged bad acts which occurred outside the jurisdiction in violation of Rule 404 of the Pennsylvania Rules of Evidence?

(2)   Whether the honorable trial court erred in precluding the proffered testimony of [Amoss' current] wife, regarding her

_____

[3] In accordance with the SOAB's recommendation, the trial court classified Amoss as a sexually violent predator and subjected him to lifetime registration pursuant to the Pennsylvania Sex Offender Registration and Notification Act, 42 Pa.C.S.A. §§ 9799.10-9799.75.

observations of [C.A.'s] demeanor, specifically after she testified at the preliminary hearing, when Commonwealth witnesses testified to [C.A.'s] state of mind/demeanor when she made the disclosure of the allegations?

Amoss' Brief at 4.

Both of Amoss' issues concern a challenge to the admissibility of evidence at trial. We review the trial court's decision to admit evidence for an abuse of discretion. *See Commonwealth v. Hairston*, 84 A.3d 657, 664 (Pa. 2014). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Id*. at 664-65 (citations omitted). "[T]he appellant sustains the 'heavy burden' to show that the trial court has abused its discretion." *Commonwealth v. Christine*, 125 A.3d 394, 398 (Pa. 2015) (citation omitted).

"All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. "Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. "Generally, evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity." *Commonwealth v. Sherwood*, 982 A.2d 483, 497 (Pa. 2009) (citing Pa.R.E. 404(b)(1)). Such evidence is admissible, however, when it is relevant for another purpose, including motive, opportunity, intent, preparation, plan,

- 10 -

knowledge, identity, or absence of mistake. *See id*. (citing Pa.R.E. 404(b)(2)).

As it relates to the common plan or scheme exception, evidence of other bad acts may be admitted where "the evidence reveals criminal conduct which is distinctive and so nearly identical as to become the signature of the same perpetrator." *Commonwealth v. Tyson*, 119 A.3d 353, 358-59 (Pa. Super. 2015) (*en banc*) (citation omitted). "Relevant to such a finding will be the habits or patterns of action or conduct undertaken by the perpetrator to commit crime, as well as the time, place, and types of victims typically chosen by the perpetrator." *Id.* at 359 (citation omitted).

Pennsylvania law also recognizes the *res gestae* exception to Rule 404(b), "permitting the admission of evidence of other crimes or bad acts to tell 'the complete story.'" *Hairston*, 84 A.3d at 665 (citations omitted). Pertinently, other bad acts evidence is admissible under the *res gestae* exception where it "was part of the chain or sequence of events which became part of the history of the case and formed a part of the natural development of the facts." *Commonwealth v. Robinson*, 864 A.2d 460, 496 (Pa. 2004). *Res gestae* evidence is of particular import and significance in trials involving sexual assault, as "[b]y their very nature, sexual assault cases have a pronounced dearth of independent eyewitnesses, and there is rarely any accompanying physical evidence. In these cases the credibility of the complaining witness is *always* an issue." *Commonwealth v. Adams-*

*Smith*, 209 A.3d 1011, 1020-21 (Pa. Super. 2019) (citation omitted) (emphasis in original).

When evidence of other crimes or bad acts may be admitted for a permitted purpose, its probative value must still outweigh its potential for unfair prejudice. *See* Pa.R.E. 404(b)(2); *see also Hairston*, 84 A.3d at 665. As this Court has explained:

> To establish one of the exceptions set forth in Rule 404(b)(2), there must be "a close factual nexus sufficient to demonstrate the connective relevance of the prior bad acts to the crime in question[.]" Additionally, the term "unfair prejudice" in Rule 404(b)(2) "means a tendency to suggest a decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." "[W]hen weighing the potential for prejudice, a trial court may consider how a cautionary jury instruction might ameliorate the prejudicial effect of the proffered evidence."

*Commonwealth v. Gilliam*, 249 A.3d 257, 271–72 (Pa. Super. 2021) (citations omitted). Importantly, the trial court is not "required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged." *Hairston*, 84 A.3d at 666 (citation omitted).

In his first issue, Amoss challenges the trial court's admission of evidentiary testimony pursuant to Rule 404(b)(2) as it pertains to alleged bad acts which occurred outside of the Commonwealth of Pennsylvania. Specifically, Amoss argues that the admission of "testimony from [C.A.,] that [he] committed sexual acts when they would be alone together on cruise ships

- 12 -

and hotels[,] was in violation of the Pennsylvania Rules of Evidence." Amoss' Brief at 9. Whereas Amoss maintains that "the Commonwealth's intent was to have [these] acts introduced to bolster their chances for a conviction" and "show [his] propensity to commit" the acts underlying the instant charges, he asserts that: (1) their admission is "not recognized as a *res gestae* exception[;]" (2) it "was not admissible as an exception [pursuant to Rule] 404(b)(2)[;]" and (3) it instead "likely led to confusion of the issues and misled the jury." *Id*. at 11. Moreover, Amoss contends that "any argument that the testimony was admissible is negated by [Rule] 404(b)(3) [as] any probative value is substantially outweighed by its potential for unfair prejudice[,]" given that these acts "would inevitably show [his] bad character and propensity which [Rule] 404 seeks to exclude[]." *Id*.

Amoss avers that because the evidence "involved uncharged acts which occurred outside of the Commonwealth[,] its admission likely confused the jury in that it would be reasonable for [its members] to wrongly assume those [Rule] 404[(b)] acts were part of the . . . charges against" him, despite the fact that the evidence "was irrelevant" in this regard. *Id*. As such, Amoss argues that "[t]he jury could not separate the [Rule] 404(b) allegations from the allegations contained in the . . . criminal information[, such that the evidence instead] diverted the jury's attention away from its duty to weigh the evidence impartially." *Id*. at 12. Indeed, Amoss asserts that because he "was not charged for this alleged conduct in Pennsylvania (nor could he be), the alleged events in Florida and on cruise ships did not tend to establish a

material fact relative to the [underlying] charges and factual basis; nor did it support a reasonable inference regarding a material fact[.]" *Id*. at 11-12.

Additionally, Amoss argues that even if the Commonwealth could establish this evidence in this regard, "it must be precluded nonetheless on the danger of unfair prejudice." *Id*. at 12. Although Amoss agrees that the "[t]rial [c]ourt correctly stated that most Commonwealth evidence is 'harmful' to a [d]efendant," he claims that "evidence regarding acts alleged to have occurred in another jurisdiction or . . . country exceeded being merely harmful, [as they were instead] extremely prejudicial." *Id*. Amoss claims that had this "evidence not been admitted, the jury's verdict may very well have been different." *Id*.

Lastly, Amoss contends "the evidence did not tend to be evidence which could be admissible for a relevant purpose[,]" as it was not relevant to show: (1) motive, as "the Commonwealth need not present a motive" in this type of case; (2) opportunity, as allegations of actions "incurred in another jurisdiction would not be germane to" the underlying charges; (3) intent, as the actions "did not occur within the Commonwealth" and there was no argument "that any touching was done negligently or recklessly[;]" (4) preparation or planning, "since the . . . acts did not occur in Pennsylvania[;]" (5) knowledge or identity, as "there was never any suggestion [C.A.] and [himself] did not know each other, nor was there any argument that . . . someone else must have committed" the acts; and (6) absence of mistake, as he "never argued that the events happened, but [that they were] just a mistake." *Id*. at 12-

13. Thus, Amoss argues that because "there is no relevant evidence exception in [Rule] 404(b)(2) which would support" the admissibility of this testimony, this Court should grant him a new trial. *Id*. at 13.

The trial court considered Amoss' first issue and determined that it was without merit, reasoning as follows:

> This [c]ourt believes that a review of the record will clearly show that the testimony argued as inappropriate by [Amoss] was offered and allowed for the purpose of showing [Amoss'] plan and pattern of behavior. Testimony regarding [Amoss'] out-of-county abuse of [C.A.] in this case helps to establish a pattern of behavior, in which [Amoss] extensively planned opportunities to be alone with [C.A.], as well as demonstrated his knowledge of the wrongness of such actions. While such testimony was prejudicial, it was not unfairly so, and the prejudice did not outweigh its probative value. Accordingly this testimony is allowable under Pa.R.E. 404(b)(2).

Trial Court Opinion, 11/20/24, at 2.

Based on our review, we determine the trial court did not abuse its discretion when it permitted C.A. to testify with respect to those sexually abusive actions Amoss committed while the two were traveling outside of the Commonwealth. Instantly, the evidence at issue concerns testimony that Amoss would on multiple occasions engage in sexually abusive behavior while alone with C.A. during their travels, to the extent that he would have her remove her clothing and masturbate him while he touched her legs, genitals, and chest. We cannot overstate that but for the location of these acts, this sexual behavior mimics exactly that which occurred in Amoss' bedroom in Pennsylvania. Accordingly, the admission of this evidence at trial was clearly

permissible pursuant to Rule 404(b)(2), as it was demonstrative of an overarching plan in which Amoss would sexually abuse C.A. in this manner while she was isolated from her mother and younger brother. **See** Pa.R.E. 404(b)(2); **see also Tyson**, 119 A.3d at 358-59 .

Moreover, because these instances of abuse were so similar to those that occurred in Pennsylvania, we do not conclude that their admission unduly and unfairly prejudiced Amoss to the extent that it suggested a decision on an improper basis or diverted the jury's attention away from its duty to weigh the evidence impartially, as it only revealed that this type of "routine" behavior also occurred outside of the Commonwealth. N.T., 3/13/24, at 117; **see also Gilliam**, 249 A.3d at 271–72. Furthermore, we note the trial court administered an appropriate cautionary instruction to the jury, which was sufficient to ameliorate any undue prejudice resulting from the admission of this evidence. **See** N.T., 3/14/24, at 295-96; **see also Gilliam**, 249 A.3d at 272.

As it relates to the admission of C.A.'s testimony describing those distinct methods of sexual abuse that occurred solely while she and Amoss were traveling outside of the Commonwealth — such as Amoss' coaxing of C.A. into completing a sexual survey, his speaking to her about sex at night while sleeping in the same bed, and his placing his penis in her mouth during a "game" where she was disrobed and blindfolded — we similarly determine that the trial court did not abuse its discretion in this regard. In doing so, we emphasize that these distinct forms of abuse did not occur in isolation, but

that they instead coexisted with those methods of sexual abuse that Amoss regularly employed in his Pennsylvania home. Accordingly, the testimony regarding these intertwined events was necessary to develop and understand the "complete story" as to how Amoss isolated and sexually abused C.A. between the ages of six and ten. **Hairston**, 84 A.3d at 665-66; **see also Robinson**, 864 A.2d at 496; **Adams-Smith**, 209 A.3d at 1020-21. Indeed, we stress that the trial court was not required to sanitize those distinct ancillary methods of abuse that Amoss employed while traveling merely because C.A. had not already endured them in her home. **See id**. Consequently, because we determine that this evidence fell within the *res gestae* exception, and because we previously determined that its probative value substantially outweighed any potential for unfair prejudice, we conclude that the trial court did not abuse its discretion in granting its admission. **See Hairston**, 84 A.3d at 665; **see also Robinson**, 864 A.2d at 496; **Gilliam**, 249 A.3d at 271–72. Thus, Amoss' first issue is without merit.

In his second issue, Amoss contends that the trial court erred by preventing his current wife from testifying regarding her observations of C.A.'s demeanor following the preliminary hearing. Amoss argues that because the trial court prohibited him "from presenting evidence to rebut Commonwealth witnesses' testimony regarding [C.A.'s] state of mind[,]" it committed non-harmless error to the extent that this Court should afford him a new trial. Amoss' Brief at 13. Amoss highlights that: (1) C.A. "testified that when she told her mother what happened, she was scared and felt ashamed[;]" (2)

"[h]er mother testified that, upon making the disclosure, [she] was scared, sad, and 'upset and crying[;]'" and (3) her "brother stated that when she told him what happened she was nervous, anxious, scared and 'she looked very sad[.]'" *Id*. Additionally, Amoss points out that in light of the Commonwealth's expert's explanation regarding "the impact of sexual violence upon children," such as the delay in reporting and differing responses of child sex abuse victims, his current wife, who "was present at the preliminary hearing[,]" would have testified that she witnessed C.A. "giggling and laughing" upon "exit[ing] the courtroom after testifying." *Id*. at 14. Amoss asserts that "[t]his evidence would have been in direct contravention of testimony at trial through Commonwealth witnesses as to [C.A.'s] s[t]ate of mind and the impact the allegations had upon her." *Id*.

Amoss further claims that the trial court erred in determining "that the testimony was inadmissible" based on the fact that C.A. "was not confronted about her behavior at the preliminary hearing when she testified at trial[,]" and neither party elicited any testimony at trial regarding "what made her laugh and giggle after testifying at the preliminary hearing[.]" *Id*. Specifically, Amoss submits that the trial court's reasoning is flawed because it mistakenly treated the instant situation as one "where the witness is being confronted with a prior statement, which is necessary to bring out the inconsistent statement through another source." *Id*. at 14-15. Amoss contends that "[t]o the contrary, this was testimony to contradict [C.A.'s] actions and the impact the allegations had upon her which was testified to by

- 18 -

[her] and her family." ***Id***. at 15. As such, Amoss argues that he was "not required to first confront [C.A.] . . . before presenting evidence of her physical and emotional reactions[, as] it was being presented to contradict and otherwise impeach the testimony of [C.A.'s] brother and mother about their observations of [C.A.'s] behavior." ***Id***.

Amoss additionally argues that "there [was] no evidentiary pre-admissibility requirement that there be testimony elicited by the defense as to why [C.A.] was giggling and laughing at the preliminary hearing" given that this would "contradict[] the principle that the [a]ppellant does not have the burden of proof or an obligation to present any evidence." ***Id***. Instead, Amoss maintains that "[t]he Commonwealth could have presented rebuttal evidence by [calling C.A.] to explain her actions at the preliminary hearing." ***Id***. Indeed, Amoss avers that "[i]f the Commonwealth was permitted to present testimony of [C.A.'s] state of mind, the defense likewise has the opportunity to present evidence to the contrary." ***Id***. Thus, he claims "[t]he [t]rial [c]ourt's ruling was an abuse of discretion and not harmless error." ***Id***.

Amoss next contends that the evidence his wife would have presented "was relevant in that[] it made a fact" — C.A.'s state of mind — "more or less probable than it would without the evidence[.]" ***Id***. He challenges that this fact would have been "of consequence in determining the action" as it colors both C.A.'s "state of mind [and the] impact the allegations had upon her[,]" which the Commonwealth "made an issue[.]" ***Id***. Accordingly, Amoss emphasizes that because "[t]he Commonwealth placed state of mind in issue[,

- 19 -

it] cannot then claim prejudice as a bar to the presentation of rebuttal evidence by the defense." *Id*. at 15-16. Amoss claims that "[t]here was no exclusion available under the rules of evidence" and that "[r]ebuttal evidence as to state of mind would not cause undue prejudice to the Commonwealth[, as it] would not suggest a decision on an improper basis or divert the jury away from weighing evidence improperly." *Id*. at 16. Amoss similarly avers that "[t]he evidence would not have caused undue [trial] delay [as] the proffered testimony would have been brief and from one defense witness" such that placing the issue before the jury "would not have wasted judicial economy." *Id*.

"Further, [Amoss maintains] the evidence was not cumulative in that i[t] was not additional evidence of the same character as existing evidence[,]" and "[t]here was no other prior testimony from the defense regarding [C.A.'s] state of mind. To the contrary, it was contradictory evidence of existing evidence presented by the Commonwealth." *Id*. Amoss emphasizes that he had "a fundamental right to present defensive evidence so long as [it was] relevant and not excluded by an established evidentiary rule." *Id*. (quotation marks and citation omitted). Amoss therefore argues that because the evidence he wished to present "was relevant, and there is no exclusionary rule of evidence which would preclude its admissibility[,] the [t]rial [c]ourt erred in its ruling." *Id*. Moreover, he insists that because "the evidence was [not] overwhelming against [him to the extent that] the jury [found] him not guilty

of aggravated indecent assault[,]" the trial court's exclusion of this evidence "was not harmless error." *Id*.

Finally, Amoss avers that "[t]he [t]rial [c]ourt's reasoning that it was not known what the context was [surrounding C.A.'s] behavior at the preliminary hearing is inaccurate[,]" as he instead maintains that it "was very clear." *Id*. at 16-17. Amoss points out that "[a]fter [C.A.] testified at the preliminary hearing, presumably a stressful time for her, she was not crying, anxious, sad, nervous and depressed as described through prior Commonwealth testimony." *Id*. at 17. Accordingly, he contends "[t]he Commonwealth could have called [C.A.] on rebuttal to explain her actions[.]" *Id*. Thus, for each of the above reasons, Amoss argues that he "is entitled to a new trial." *Id*.

As noted above, when Amoss sought to introduce his current wife's testimony, the trial court denied its admission, finding that "there [was] no evidence as to what [C.A.] was laughing about[;]" she could have been laughing about "any number of things[,]" including relief from having just completed her preliminary hearing testimony; and "[a]bsent not having asked her . . . on direct [why she was laughing, there was no way for the jury to] have any context of" her behavior. N.T., 3/14/24, at 216. In its Rule 1925(a) opinion, the court further explained its reasoning for disallowing the testimony:

> It is maintained by this [c]ourt that the proffered testimony: that [C.A.] laughed with friends following the preliminary hearing, attempts to assign a value of relevance to otherwise irrelevant

- 21 -

information. Had [C.A.] been asked about such behavior on the stand and denied it, it is possible that the proffered testimony would have been relevant for rebuttal or impeachment, but such was not the case. Absent context which would make such displays relevant, we cannot consider any display of emotion by a witness or victim in or around a court hearing to be relevant.

Trial Court Opinion, 11/20/24, at 2-3.

Upon review, we similarly conclude that the trial court did not abuse its discretion by preventing Amoss from presenting testimony from his current wife, as it correctly determined that her testimony would not have been relevant. Here, the trial court aptly explained that C.A.'s behavior following the preliminary hearing could have been due to any number of reasons unrelated to the testimony that she provided during the preliminary hearing. Consequently, absent any evidence that could directly connect C.A.'s purported jovial mood following the hearing to her testimony that Amoss sexually abused her as a child, the proposed testimony by Amoss' wife would be irrelevant to the jury's evaluation of C.A.'s credibility — thus making it inadmissible at trial. **See** Pa.R.E. 402. Accordingly, we conclude Amoss' second issue is meritless as well, and we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 09/16/2025